**In re Paul William ORSO, Debtor.**

**Bankruptcy No. 94–11491.**

United States Bankruptcy Court, M.D. Louisiana.

March 23, 1998.

---

**406**

Derren S. Johnson, Baton Rouge, LA; for Debtor.

George L. Clauer, III, Baton Rouge, LA, for Valerie Canfield.

Martin A. Schott, Baton Rouge, LA, Chapter 7 Panel Trustee of Bankruptcy Estate.

## RULING

LOUIS M. PHILLIPS, Bankruptcy Judge.

Now before the court is the objection of Valerie Canfield, formerly known as Valerie Canfield Orso ("Canfield"), to the claim of exemption of Paul William Orso (the "Debtor") under La. R.S. 22:647 (1995) of the proceeds of annuities (the "Annuities") issued in accordance with § 130 of the Internal Revenue Code and pursuant to a structured tort settlement (the "Tort Settlement"), as compensation for personal injury damages sustained by the Debtor.

This court has original jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a). Pursuant to 28 U.S.C. § 157(b)(2)(A), this is a proceeding over which the court has authority to issue a final order.

1. As will be shown, this dispute is one which makes a difference, given the disparity of exemption treatment of annuities within the two states' laws.

Resolution of Canfield's objection requires that this court decide, pursuant to 11 U.S.C. § 522(b)(2)(A), the domicile of the debtor during the 180 days prior to the petition date (or where the debtor had been domiciled for the longest portion of the period), as there is a dispute over whether the debtor was domiciled in Alabama or Louisiana.[1] For reasons set forth below, the court finds that the debtor was, prior to the bankruptcy petition date, a domiciliary of the state of Louisiana.

Secondly, the court must, in light of the domicile finding, determine whether the Fifth Circuit case, *Matter of Young*, 806 F.2d 1303 (5th Cir.1987),[2] is controlling authority which dictates the outcome requested by the objector, that the debtor's rights in, to, and upon the "annuities" and the payments thereunder are not properly claimable as exempt under Louisiana law. As will be shown, the court concludes that *Young* is inapplicable to this proceeding, and that upon analysis of the Louisiana state law of exemption of annuities (along the way, the court takes a look at *Young* and finds, to its satisfaction, that it does not correctly state Louisiana law on the issue of annuities and exemptions and that a future panel of the court, if faced with the same question raised in *Young*, would be bound to reverse it), Orso's rights in, to, and upon the annuities at issue are exempt.

For reasons set forth below, the court dismisses the objection of Canfield.

## FINDINGS OF FACT

### A. The Accident and the Tort Settlement.

On November 11, 1986, only a few months after he married Canfield, the Debtor's life as he, his wife, his family, and his friends knew it was forever and inexorably altered. As a result of a closed head injury which he sustained in a car accident on that date, the Debtor was permanently and severely brain damaged, rendering him mildly mentally re-

2. In *Young*, the Fifth Circuit held that attorney's fees arising out of a debtor-attorney's representation of an injured party, payable through an annuity, were a non-exempt account receivable, rather than an annuity exempt under Louisiana law.

tarded with an I.Q. of less than seventy and unable to function as he had prior to the accident.

On November 9, 1987, the Debtor and Canfield filed suit against Cook Construction Company, Inc. of Mississippi ("Cook Construction") and its insurer, Liberty Mutual Insurance Company ("Liberty Mutual"); C & S General Contractors, Ltd. ("C & S") and its insurer, American General Fire & Casualty Company ("American General"); and the State of Louisiana (the "State"), in the Eighteenth Judicial District Court in the Parish of West Baton Rouge, Louisiana, seeking damages as a result of the injuries the Debtor had sustained in the car accident. On September 29, 1989, the Debtor and Canfield entered into a Consent Judgment with the defendants (the "Consent Judgment").

Pursuant to the Consent Judgment, Cook Construction and its insurer, Liberty Mutual, agreed to pay to Canfield the sum of $39,375.00, upon the signing of the judgment, and agreed to pay to the Debtor the sum of $240,846.45, upon the signing of the judgment, plus $1,180.00 per month to the Debtor for life, commencing October 15, 1989, with thirty years of these monthly payments guaranteed to him or to his estate should he die before thirty years. In addition, C & S and its insurer, American General, agreed to pay to Canfield the sum of $3,750.00, and to pay to the Debtor the sum of $41,704.55, upon the signing of the judgment. Lastly, the State agreed to pay to Canfield the sum of $19,375.00, upon the signing of the judgment, and to the Debtor the sum of $55,625.00 upon the signing of the judgment, plus the sum of $850.00 monthly for life, with thirty years of these payments being guaranteed to the Debtor or to his estate should he die before thirty years, with such payments commencing on October 26, 1989. In addition, the State agreed to pay the following lump sum payments to the Debtor: $5,000 to be paid at the end of five years from entry of the Consent Judgment; $15,000 at the end of ten years from entry of the Consent Judgment; $20,000 at the end of fifteen years from entry of the Consent Judgment; and $35,000 at the end of twenty years from entry of the Consent Judgment.

The parties to the Tort Settlement also agreed that all funds paid to the Debtor and to Canfield were their respective separate property. In return for receiving these sums of money, the Debtor and Canfield agreed to dismiss with prejudice all their claims against the defendants.

Also on September 29, 1989, the Debtor, Cook Construction, and Liberty Mutual entered into a Settlement and Release and Satisfaction of Consent Judgment (the "Liberty Mutual Agreement"). The Liberty Mutual Agreement provided that Cook Construction or Liberty Mutual had the right to:

> ... fund Periodic Payments [to the Debtor] by purchasing a "qualified funding asset," within the meaning of Section 130(d) of the Internal Revenue Code, in the form of an annuity policy from Liberty Life Assurance Company of Boston [the "Liberty Mutual Annuity"]. All rights of ownership and control of such annuity policy shall be vested in the Defendant [Cook Construction] or the Insurer [Liberty Mutual].

Moreover, in the Liberty Mutual Annuity "Policy Information," the Debtor is designated as the "Annuitant," if living; otherwise, all payments made pursuant to the Annuity are to be made to the following beneficiaries: to Janice Elaine Orso, the Debtor's mother, and Adam Paul Orso, the Debtor's father, equally, if living, and if not living, to the survivor, if any, and otherwise to the Estate of the last surviving payee. In addition, regarding a change of beneficiary of the Liberty Mutual Annuity, this Annuity states:

> You [the Owner—Cook Construction or Liberty Mutual] may change the Owner or any Beneficiary by *written request* during the Annuitant's lifetime.

Therefore, the Debtor is the annuitant, but not the owner, under the Liberty Mutual Annuity, and lacks the authority to change beneficiaries under this Annuity. As the recipient of the proceeds of the Liberty Mutual Annuity, the Debtor, however, is the payee under this Annuity.

Like Cook Construction, the State also desired to purchase an annuity to fund its obligation to the Debtor, and on September

22, 1989, the Debtor, Canfield, and the State entered into a Receipt and Release and Indemnity Agreement (the "State Agreement"), pursuant to which the State assigned its obligation to make future periodic payments to Conseco Annuity Guaranty Company ("Conseco"), which agreed to fund this obligation by purchasing an annuity from Western National Life Insurance Company ("Western National").

The State Agreement provides that Conseco is the Owner of the Western National Annuity and that Conseco has the sole authority to change beneficiaries:

> Conseco, as owner of the annuity contract purchased to fund the periodic payment obligation [to the Debtor], possesses the sole authority to designate a change of beneficiary, but in no event shall the request of the payee be unreasonably withheld or denied.

Moreover, in the Western National Annuity, the Debtor is the "Measuring Life," *i.e.*, the Annuitant. The Western National Annuity does not appear to designate beneficiaries.

**B. The Separation and its Aftermath.**

Shortly after the Tort Settlement of the lawsuit, the Debtor's and Canfield's marriage apparently deteriorated, and on May 21, 1990, a Judgment of Separation was entered in the family court of East Baton Rouge Parish, Louisiana. On that same date, the Debtor and Canfield entered into a Settlement of Community Agreement pursuant to which the debtor agreed to transfer to Canfield the house in which they had lived in Baton Rouge, all household furniture, furnishings, appliances, and equipment located in the house, all of Canfield's personal clothing and belongings, including personal jewelry, and a 1988 Ford Mustang. Canfield agreed to assume the $72,000 note covering the house, and to be responsible for paying off the balances on two credit cards.

In addition, the Debtor and Canfield acknowledged that any funds they had received pursuant to the Tort Settlement of the lawsuit were separate funds, and Canfield relinquished any interest she might have in the Debtor's social security benefits, Navy benefits, and a 1990 Jeep Wrangler. Finally, the Debtor agreed to pay to Canfield $1,250 per month through May, 1994, if Canfield remained enrolled as a student, either part-time or full-time, at Louisiana State University ("LSU") until that date, but that if Canfield dropped out of LSU, then the monthly payments would decrease to $1,000 per month, with all payments terminating in May, 1994. However, if Canfield dropped out of LSU and then re-enrolled, the monthly payments again would increase to $1,250 per month for all such months that she was enrolled as an LSU student, until May, 1994, when all payments would terminate.

Canfield apparently could not make the mortgage payments on the house, so on August 31, 1990, the Debtor and Canfield executed an Amended Settlement of Community Agreement, which amended the prior Settlement of Community Agreement only in that the Debtor agreed to pay to Canfield $15,000, to be paid in fifteen monthly installments of $1,000, unless the community home was sold during that time, in which case the full balance of the $15,000 would be due. In return, Canfield transferred the house to the Debtor, who assumed the $72,000 note thereon.

On January 18, 1991, in the family court of East Baton Rouge Parish, Louisiana, it was ordered that the Debtor and Canfield be granted a divorce.

**C. The Interdiction and the Medical Findings.**

On May 23, 1992, the Debtor's mother, Janice Orso, filed in the 19th Judicial District Court of East Baton Rouge Parish, Louisiana, a petition of interdiction, seeking to have herself appointed as the Debtor's curator and the Debtor's father, Adam Orso, as undercurator. The reasons given for this petition were as follows:

> Paul William Orso experiences difficulties in a number of areas as a result of a closed head trauma and, as a result, has language related deficiencies, significant motor coordination problems, visual tracking difficulties, difficulty with various language functions, including speech, verbal abstractions, vocabulary skills and some common sense understanding of social norms and customs, motor slowing and impaired visual

coordination. Furthermore, Paul William Orso is in constant need of assistance to deal with his personal matters and to manage his affairs due to the brain damage which resulted from his automobile accident.

On May 29, 1992, the 19th Judicial District Court of East Baton Rouge Parish ordered that the Debtor's mother be appointed the Debtor's provisional curator pending the appointment of the curator, that the Debtor's father be appointed the provisional undercurator of the Debtor, and that Dr. Charles Tessier, a general practitioner, be appointed as an expert to examine the Debtor.

On June 22, 1992, Dr. Tessier examined the Debtor, and in a letter to the 19th Judicial District Court dated August 18, 1992, made the following findings regarding the Debtor:

> This patient [was] first presented to my office on 6/22/92, as being referred to my clinic for evaluation as to this patient's mental capacities and being able to handle financial needs appropriately. When this patient [was] presented to our office, he could not relate to our medical staff as to why he was here when he first checked in. His affect was very inappropriate in the waiting room and he seemed to be very fidgety, pacing, walking in and out of the building prior to my examining him. When asked to come back, the patient spoke with me and, initially, could not relate to me why he was there. He rambled on about many things. He couldn't relate that he was in an accident in 1986[3] in which he was in a coma that he thinks [was] for approximately two months.... During the office exam, he is noted to have definite speech defects, equilibrium problems in not being able to stand straight at all times and had a positive Romberg test confirming his disequilibrium problems.... My impression [was] that he had multiple neurological deficits status post neurological injury.... I could definitely see that the patient is unable to handle

financial type planning and would be extremely irresponsible concerning large sums of money or important decisions.... Again it is my opinion that this patient is definitely unable to perform financial planning and, evidenced by my own physical exam, ... the multiple evidences of medical data ... support this. I think it would be disastrous to have this patient controlling any large sums of money or being able to [conduct] financial planning for himself.

In this letter, Dr. Tessier also agreed with the findings of the LSU Speech and Hearing Clinic, which found that the Debtor has a language disorder, as was evidenced by his lack of comprehension of reading passages and by his failure to comprehend many simple words and complex sentences, resulting in many incorrect answers to questions. In his deposition, Dr. Tessier also testified that the Debtor had:

> ... flight of ideas.... [I]t was kind of hard to pin him down as to exactly why he was here and his past, but all of a sudden, he told [m]e, he said he had been having a driver's license since 1987. He stated his ex-wife wanted sixty thousand dollars more from him.... He told me that he was not able to deal with big financial type things and he said, such as his mother and father having to sell his house for him.[4]

Dr. Tessier also agreed with the findings of Dr. Richard Strobach, who examined the Debtor on April 15, 1992, for disability determination services. Dr. Strobach, a psychiatrist, had diagnosed the Debtor with "organic brain syndrome," which means that the Debtor had a depressed mood due to brain damage, and that as a result of the organic brain syndrome, the Debtor had suffered and would continue to suffer a moderately severe to severe restriction of daily activities due to his regression, irritability, poor impulse control, depression, decreased concentrating ability, decreased recent and remote memory ability, mild mental retardation, decreased abstracting ability, and decreased judgment. Specifically, the symptoms of organic brain

---

**3.** In his deposition on February 9, 1994, Dr. Tessier testified that this statement in his letter of August 18, 1992, was incorrect in that the Debtor *did* admit to having been in an accident, but

could not relate how long he had been in a *coma*. *See* Deposition of Dr. Tessier, at 30.

**4.** *See* Deposition of Dr. Tessier, at 16.

syndrome that the Debtor suffers are apathy, anarchy, sadness, sleep disturbances, withdrawal, agitation, and irritability.

Moreover, Dr. Strobach found that because of the Debtor's organic brain syndrome, the Debtor had suffered moderate deterioration of his personal habits, his ability to relate to others had been impaired from a moderately severe to a severe degree, and that since the accident the Debtor had been barely able to function without structure. In addition, Dr. Strobach found that because the accident "probably cost him I.Q. points," [5] the Debtor was mildly mentally retarded, with an I.Q. of below 70, and that the Debtor was "cognitively pretty seriously impaired." [6]

In describing the Debtor's impairment, Dr. Strobach stated:

Well, anyone with a concentration deficit combined with a recent memory deficit is going to have problems understanding anything that is said to them or anything that they might read, because as they read it they're going to be forgetting what they read, or as they're listening they're going to forget what they hear. As I recall, he [the Debtor] didn't remember three objects after three minutes, which most people can do. So in a span of three minutes, he's forgotten what has been said to him. You can imagine the confusion that would create.... This type of damage ... tends to be static. These people will sustain brain damage from an accident, there is loss of some type of central nervous system functioning, they may get back some abilities like hand movements or arm movements or this sort of thing, but the cognitive losses tend to be static, meaning that if you test them one year after the trauma, two years, three years, et cetera, you just keep doing serial testing, the losses remain exactly the same. There's no further deterioration, there is no further gain. [7]

With regard to whether, in his opinion, the Debtor could manage his own funds, Dr.

Strobach found that the Debtor was not capable of controlling his own funds:

... because of the [Debtor's] concentration and memory deficits.... It would be very easy for him to give money away and not remember what he did with it, or pay a bill, go back and pay that same bill again, have somebody come up to him and say, "Oh, you owe me $50. Don't you remember yesterday I gave it to you," and he wouldn't remember, this sort of thing. [8]

Regarding the Debtor's prognosis, Dr. Strobach stated:

It's poor. There is just no chance he will ever recover or—with our technology now. If he lives into the next century and somehow there's a miracle in advancement, maybe things could change, but as the state of the art exists now, the prognosis is terrible. [9]

Finally, Dr. Strobach gave the following compelling analogy regarding the seriousness of the Debtor's impairment:

There's a couple of ways I can give you examples here. In his case he does not have recent memory ability, he doesn't— his remote memory is impaired, and he has very poor concentrating ability. He would resemble somebody, say, in a moderate state of Alzheimer's, if you were comparing him against somebody you want to look at in another diagnostic category. He would resemble a child who's mentally retarded ... [to a] [m]ild degree. He would resemble somebody who, if you give him three things to do, perhaps does one and forgets the other two. If I can take an inanimate object and describe and make a comparison, it's a little bit easier. If you have a T.V. with a cable and you get 50 channels, and I can go into your T.V. and play with that circuit and do some damage so that now you're only getting ten channels, and that those ten channels, a couple of them are fuzzy and one of them you don't get sound on, that would be the kind of brain

---

5. *See* July 10, 1992, deposition of Richard P. Strobach, M.D., at 11.

6. *See* Deposition of Dr. Strobach, at 11.

7. *See* Deposition of Dr. Strobach, at 11, 12, 14.

8. *See* Deposition of Dr. Strobach, at 17.

9. *See* Deposition of Dr. Strobach, at 23.

damage he would have. And this would be a good example too, because your T.V. set would stay that way forever. You would always be without those channels, and those channels that were impaired of the remaining ten would always look the same way.[10]

Dr. Strobach admitted that "some of these channels are not impaired at all,"[11] so that the Debtor could form sentences and words. If given time, he could express himself; he could follow a routine; if given directions and ample time to get there, with enough time to get lost and back on track, the Debtor could find his way some place; dress himself; brush his teeth; feed himself; and do the simple routine things of living. However, Dr. Strobach noted that the Debtor's situation was worse than that of someone who is mildly mentally retarded:

> This [mild mental retardation] is different for Mr. Orso's situation. A retarded person is kind of globally subdued cerebrally, okay, across the board. In Mr. Orso's case he is brain damaged in specific areas, and in terms of comprehension or concentration, if you tap into those areas of deficits, there is going to be no functioning or understanding, as opposed to the mentally retarded person who, as you tap into the different areas, there is some level of comprehension and understanding.... In his case he has specific losses, and when you tap into those there's going to be no comprehension.[12]

On September 3, 1992, the court tried the interdiction suit, ordered the limited interdiction of the Debtor, and ordered that the Debtor's mother be appointed limited curatrix of the Debtor, so that she could "handle all contractual, financial and business matters related to Paul William Orso, including the payment of his living expenses, management of any monies to which he is entitled, approval of any contractual agreements which may be entered into on his behalf." On September 8, 1992, the court issued Letters of Curatorship to the Debtor's mother, certifying that she had been appointed as limited curatrix of the Debtor.

## D. Canfield's judgment against the Debtor, the Debtor's move to Alabama, and the Debtor's Chapter 7 bankruptcy petition.

The Debtor did not pay Canfield the sums due to her under the Amended Settlement of Community Agreement, and on December 19, 1990, Canfield filed a Petition to Enforce Contractual Obligation in the 19th Judicial District Court in the Parish of East Baton Rouge, Louisiana. In her petition, Canfield stated that the Debtor had not paid her the sums due under the Amended Settlement of Community Agreement since September 1990, and requested the total sum of $5,000.00, representing arrearages, and also any sums that might become due and owing after December 19, 1990.

On January 25, 1994, the Debtor's mother filed a motion to substitute herself, as the Debtor's limited Curatrix, in Canfield's suit against the Debtor. On January 25, 1994, the district court issued oral reasons for judgment in the amount of $48,000 in arrearages in favor of Canfield, and further ordered the Debtor to pay Canfield $1,000 per month for the succeeding five months. The district court signed a judgment to this effect on July 7, 1994.[13]

Sometime in March, 1994, the Debtor "moved" to Mobile, Alabama. In Mobile, the Debtor leased an apartment, opened a credit union account with a small balance for living expenses, obtained an Alabama driver's li-

---

10. *See* Deposition of Dr. Strobach, at 28–29.

11. *See* Deposition of Dr. Strobach, at 29.

12. *See* Deposition of Dr. Strobach, at 39–41.

13. The Debtor's appeal of the July 7, 1994, state-court judgement against him has been stayed pending resolution of the exemption and dischargeability issues. Neither the Debtor nor Canfield has presented to this court the question of the finality of the state court judgment, which curiously is a combination judgment for past due arrears under the Amended Settlement of Community Agreement *and* for injunctive relief ordering the Debtor to comply with the remaining payment obligations under the Amended Settlement of Community Agreement. Perhaps this form of relief is an appropriate response to the fact that the Amended Settlement of Community Agreement does not have an acceleration clause regarding the Debtor's obligations to Canfield; perhaps not.

cense, changed his vehicle registration to Alabama, and transferred his car insurance to Alabama.

The Debtor's mother stated in the § 341(a) creditor's meeting that he moved to Mobile "to be around his grandparents and stuff like that and to get away from Baton Rouge and the memories." [14] Nevertheless, the Debtor quickly learned that his hope of spending time with his relatives was quite unrealistic, for they were busy working and had little time to spend with him during the week.

*Every* weekend, the Debtor *always* returned to Baton Rouge to stay with the few people who remained in his significantly altered life: his then-girlfriend Tammy, with whom he maintained a relationship until the latter part of 1994; his brother; and his childhood buddy Wayne, who still lives in the same neighborhood in which the Debtor grew up. In addition, the Debtor continued to visit his optometrist in Louisiana and to seek medical care from the V.A. Hospital in Louisiana, to do his laundry in Baton Rouge, to maintain his Baton Rouge bank accounts, to have his prized truck repaired in Louisiana, to keep his Louisiana voter registration, to maintain his Baton Rouge health club membership, and to keep his East Baton Rouge Parish Library card.

On December 24, 1994, the Debtor filed a Chapter 7 petition in the United States Bankruptcy Court for the Middle District of Louisiana. On March 24, 1995, Canfield filed a Proof of Claim with this court, in the amount of $53,494.92, pursuant to the July 7, 1994, Judgment issued by the 19th Judicial

District Court in the Parish of East Baton Rouge, Louisiana. On March 27, 1995, the court entered an Order denying Canfield's motion for relief from automatic stay, denying Canfield's motion requesting the court to abstain from exercising jurisdiction over the case, and denying Canfield's motion to dismiss.

In March or April, 1995, the Debtor "moved" back to Baton Rouge, Louisiana, and on April 24, 1995, he registered his vehicle in Louisiana and obtained a Louisiana driver's license.

## CONCLUSIONS OF LAW; DISCUSSION

### I. *The Debtor's Domicile And Choice of Law.*

### A. The Role of Domicile Within the Scheme of Exemptions as set forth in § 522 of the Bankruptcy Code.

■ The filing of a bankruptcy case creates an estate which is composed of all of the debtor's property, as defined in § 541, including "all legal or equitable interests of the debtor in property as of the commencement of the case." [15] Section 522, however, permits a debtor to exempt property from the bankruptcy estate by claiming certain exemptions authorized by that section.

Section 522 provides the debtor with a choice between two exemption schemes, but federalizes a state's right to limit a debtor's choice. Under § 522(b),[16] the debtor may choose the federal exemptions set forth in subsection (d),[17] unless the state law that is

---

14. January 26, 1995, § 341(a) meeting of creditors, at 26–27.

15. *See* 11 U.S.C. § 541(a)(1) (1995). All citations of statutes are to the Bankruptcy Code, unless otherwise indicated.

16. Section 522(b) provides in pertinent part:
(b) Notwithstanding section 541 of this title [Title 11], an individual debtor may exempt from property of the estate the property listed in either paragraph (1) or, in the alternative, paragraph (2) of this section.... Such property is—
(1) property that is specified under subsection (d) of this section, unless the State law that is applicable to the debtor under paragraph (2)(A) of this subsection specifically does not so authorize; or, in the alternative,

(2)(A) any property that is exempt under Federal law, other than subsection (d) of this section, or State or local law that is applicable on the date of the filing of the petition at the place in which the debtor's domicile has been located for the 180 days immediately preceding the date of the filing of the petition, or for a longer portion of such 180–day period than in any other place.

\* \* \* \* \* \*

11 U.S.C. § 522(b)(2)(A).

17. Section 522(d)(11)(D) provides an exemption for "[t]he debtor's right to receive, or property that is traceable to—... a payment, not to exceed $ 15,000, on account of personal bodily injury, not including pain and suffering or compensation for actual pecuniary loss, of the debtor or an

applicable to the debtor pursuant to § 522(b)(2)(A) specifically does not so authorize. Alternatively, the debtor may choose under § 522(b)(2)(A) the exemptions to which the debtor is entitled under other federal law **and state or local law which is applicable on the date of the filing of the petition at the place in which the debtor's domicile has been located for the 180 days immediately preceding the date of the filing of the petition, or for a longer portion of such 180–day period than in any other place.**

■ The power of a state to "opt out" of the federal exemptions available to the debtor under § 522(d), thereby requiring debtors to choose a state's exemption scheme (and concomitantly allowing the debtor to obtain the benefits of "other federal law" than of § 522(d)) is limited by these domicile requirements. For a state to exert its influence over a debtor, therefore, the state law (or local law, if applicable) must be applicable by virtue of the debtor's **domicile** during the 180 days before bankruptcy.

■ Pursuant to § 522(b)(2)(A), both Alabama and Louisiana have chosen to "opt out" of the federal exemptions established in § 522.[18] The debtor's domicile during the 180 days before bankruptcy must be determined in order to determine the applicable law concerning the exemption of annuities.

For reasons that will become immediately clear, Canfield initially argues that Alabama was Orso's domicile during the relevant time frame; Orso argues Louisiana.

**1. The Difference Between Alabama and Louisiana Exemption Law.**

The domicile issue arises because there is a significant difference between Alabama and Louisiana exemption law regarding the extent to which annuities are exempt from seizure (and therefore can be exempted within a bankruptcy case).

Alabama exemption law limits the total exemption of benefits payable to an annuitant to $250.00 per month, although the court may give due regard to the reasonable requirements of the judgment debtor and his family, if they are dependent upon him. Section 27–14–32 of the Alabama Code provides:

(a) The benefits, rights, privileges and options which under any annuity contract, heretofore or hereafter issued, are due or prospectively due the annuitant shall not be subject to execution, nor shall the annuitant be compelled to exercise any such rights, powers, or options, nor shall creditors be allowed to interfere with or terminate the contract, except:

\* \* \* \* \* \*

individual of whom the debtor is a dependent," and section 522(d)(11)(E) provides an exemption for "[t]he debtor's right to receive, or property that is traceable to—... a payment in compensation of loss of future earnings of the debtor or an individual of whom the debtor is or was a dependent, to the extent reasonably necessary for the support of the debtor and any dependent of the debtor." *See In re Ziegler,* 156 B.R. 151 (Bankr. W.D.Pa.1993) (Chapter 7 debtor claimed personal injury settlement proceeds, in the form of a lump-sum payment and·monthly payments pursuant to an annuity contract, as exempt under § 522(d)(11)(D) and (d)(11)(E); court held: (1) the debtor was entitled to the § 522(d)(11)(D) exemption to be paid from the annuity contract; but (2) the debtor was not entitled to the § 522(d)(11)(E) exemption because the annuity contract did not represent "compensation of loss of future earnings," in that the debtor returned to work within a month following his personal injury accident and the debtor had suffered no impairment in his earning ability as a result of the accident). *See also In re Smith,* 179 B.R. 437, 446 n. 4 (Bankr.E.D.Pa.1995) (finding that

the debtor's annuity was akin to future earnings, for purposes of § 522(d)(11)(E)).

**18.** *Alabama Code § 6–10–11 provides:*

In cases instituted under the provisions of Title 11 of the United States Code entitled "Bankruptcy," there shall be exempt from the property of the estate of an individual debtor only that property and income which is exempt under the laws of the state of Alabama and under federal laws other than subsection (d) of Section 522 of said Title 11 of the United States Code.

Alabama Code § 6–10–11 (1995).

Similarly, La. R.S. 13:3881(B)(1) provides:

In cases instituted under the provisions of Title 11 of the United States Code, entitled "Bankruptcy," there shall be exempt from the property of the estate of an individual debtor only that property and income which is exempt under the laws of the state of Louisiana and under federal laws other than Subsection (d) of Section 522 of said Title 11 of the United States Code.

La. R.S. 13:3881(B)(1) (West Supp.1995).

(2) The total exemption of benefits presently due and payable to any annuitant periodically or at stated times under all annuity contracts under which he is an annuitant shall not at any time exceed $250.00 per month for the length of time represented by such installments, and such periodic payments in excess of $ 250.00 per month shall be subject to garnishment; (3) If the total benefits presently due and payable to any annuitant under all annuity contracts under which he is an annuitant shall at any time exceed payment at the rate of $ 250.00 per month, then the court may order such annuitant to pay to a judgment creditor or apply on the judgment, in installments, such portion of such excess benefits as to the court may appear just and proper, after due regard for the reasonable requirements of the judgment debtor and his family, if dependent upon him, as well as any payments required to be made by the annuitant to other creditors under prior court orders.

Alabama Code § 27–13–32 (1975).[19]

In contrast, Louisiana exemption law places no monetary cap on the exemption of proceeds of annuities, and provides as follows:

\* \* \* \* \* \*

B. The lawful beneficiary, assignee, or payee, including the annuitant's estate, of an annuity contract, heretofore or hereafter effected, shall be entitled to the proceeds and avails of the contract against the creditors and representatives of the annuitant or the person effecting the contract, or the estate of either, and against the heirs and legatees of either such person, saving the rights of forced heirs, and such proceeds and avails shall also be exempt from all liability for any debt of such beneficiary, payee, or assignee or estate, existing at the time the proceeds or avails are made available for his own use.

La. R.S. 22:647(B) (1995).

**2. Is The Debtor's Domicile Louisiana or Alabama for Purposes of 11 U.S.C. § 522(b)(2)(A)?**

As mentioned, § 522(b)(2)(A) sets forth a choice-of-law provision with regard to the applicable exemption law, providing that the state law applicable to the debtor's domicile can require utilization of state exemptions.

As the court makes the domicile determination, we bear in mind the following words of Justice Stone: "When one intends the facts to which the law attaches consequences, he must abide the consequences whether intended or not." [20] The conflict between Alabama and Louisiana exemption law well illustrates this admonition, at least with regard to the Debtor's choice of domicile.

■ A federal court must apply the choice-of-law rules of the state in which the court sits. *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941) (holding that the *Erie* doctrine applies to choice-of-law rules).[21] Accordingly, this court will apply Louisiana choice-of-law rules to decide whether Alabama law or Louisiana law determines the Debtor's domicile in the 180–day period immediately preceding the filing of his bankruptcy petition on December 24, 1994.[22]

■ According to Article 3518 of the Louisiana Civil Code, this court must look to the law of the forum, Louisiana, to determine the domicile of the Debtor, for the purposes of § 522(b)(2)(A). Article 3518 of the Louisiana Civil Code provides:

For the purposes of this Book [Book IV— Conflict of Laws], the domicile of a person

---

19. *See In re Dees*, 155 B.R. 238 (Bankr.S.D.Ala. 1992) (court stated that the use of the word "may" in § 27–13–32(a)(3) of the Alabama Code indicated the discretion of the Court to determine whether annuity benefits in excess of $250.00 per month should be garnished or be available for the support of the debtor and his or her family, noting that Alabama courts have not published opinions providing guidance on the application of this provision).

20. *State of Texas v. State of Florida*, 306 U.S. 398, 425, 59 S.Ct. 563, 576, 83 L.Ed. 817 (1939).

21. Section 522(b) does not prescribe a federal analysis of domicile. In fact, mention of domicile within the bankruptcy scheme is slight, not being defined in the Code (see § 101), it is only briefly mentioned with § 109 (who can be a debtor) and is referred to as one of the grounds of determining a proper venue for a bankruptcy case (see 28 U.S.C. § 1408).

22. *See generally*, Joseph Dainow, Conflict of Laws: Domicile, 11 La. L.Rev. 141 (1951).

is determined in accordance with the law of this state [Louisiana].

La. Civ.Code art. 3518 (1995).[23]

a. Determination of "Domicile."

 Article 38 of the Louisiana Civil Code defines "domicile" as:

The domicile of each citizen is in the parish wherein he has his principal establishment. The principal establishment is that in which he makes his habitual residence; if he resides alternately in several places, and nearly as much in one as in another, and has not declared his intention in the manner hereafter prescribed, any one of the said places where he resides may be considered as his principal establishment, at the option of the persons whose interests are thereby affected.

La. Civ.Code art. 38 (1995).[24]

 The term "domicile" is defined as the relation which the law creates between an individual and a particular locality or country, and is the legal conception of "home," being derived from the Latin *domus*, which means "home" or "dwelling house." [25] Domicile is the place where a person has his fixed, true, and permanent home and principle establishment, and to which, whenever he is absent, he has the intention of returning.[26]

b. Change of Domicile.

With regard to changing one's domicile, Articles 41–43 of the Louisiana Civil Code provide:

Art. 41. Change of domicile; residence and intent

A change of domicile from one parish to another is produced by the act of residing in another parish, combined with the intention of making one's principal establishment there.

Art. 42. Proof of intent by written declaration

This intention is provide by an express declaration of it before the recorders of the parishes, from which and to which he shall intend to remove. This declaration is made in writing, is signed by the party making it, and registered by the recorder.

Art. 43. Proof of intent in absence of declaration

In case this declaration is not made, the proof of this intention shall depend upon circumstances.

La. Civ.Code arts. 41–43 (1995).

 One's domicile of origin continues provide a choice for substantive, choice-of-law purposes. *See, e.g., Wogan v. Folse,* 156 La. 393, 100 So. 540 (La.1924).

---

**23.** Comments (a) and (b) to Article 3518 offer discussion of this Article.

(a) **Purpose of this Article.** This Article designates the law under which domicile is to be determined....

(b) **Domicile determined according to the law of the forum.** This Article provides that the place where a person, natural or juridical, is domiciled is to be determined according to Louisiana law (see, *e.g.,* La. Civ.Code Arts. 38–46 (1870)), even in cases where that person is ultimately found to be domiciled in another state. This provision is consistent with present jurisprudence as well as with the principle that characterization is normally conducted in accordance with the law of the forum. See, *e.g.,* Restatement Second, Conflict of Laws, § 13.

**24.** Observe that the clause "if he resides alternately in several places, and nearly as much in one as in another, and has not declared his intention in the manner hereafter prescribed, any one of the said places where he resides may be considered as his principal establishment, at the option of the persons whose interests are thereby affected," provides an option for *procedural* purposes only, such as with regard to whether jurisdiction or venue is proper. This option does *not*

**25.** *See Shreveport Long Leaf Lumber Co. v. Wilson,* 38 F.Supp. 629 (W.D.La.1941).

**26.** *Id.* Black's Law Dictionary defines "domicile" similarly:

That place where a man has his true, fixed, and permanent home and principal establishment, and to which whenever he is absent he has the intention of returning.... The permanent residence of a person or the place to which he intends to return even though he may actually reside elsewhere. A person may have more than one residence but only one domicile.... The established, fixed, permanent, or ordinary dwellingplace or place of residence of a person, as distinguished from his temporary and transient, though actual, place of residence. It is his legal residence, as distinguished from his temporary place of abode; or his home, as distinguished from a place to which business or pleasure may temporarily call him.

Black's Law Dictionary 435 (5th ed.1979).

until another is acquired.[27] The party seeking to show a change of domicile must overcome the legal presumption that domicile has not been changed, by positive and satisfactory proof of the establishment of a new domicile as a matter of fact, with the intent to remain and to abandon the former domicile.[28] As long as reasonable doubt regarding a change of domicile remains, the presumption is not rebutted.[29] Moreover, the presumption that whenever a person has acquired a residence elsewhere and actually resides there, that is his domicile, is applicable where there is only one obvious place of residence, and where the person, while maintaining some ties with his former domicile, does not actually have a place to reside there.[30]

The determination of domicile involves proof of intent as well as of objective facts.[31] Intent is proven by the actual state of facts, and not what one declares them to be.[32] A "floating intention" to return to one's previous residence at some indefinite future date does not establish that one had the intent to retain one's domicile in the former state.[33] Rather, residence in fact and the intention to make the place of residence one's home, as disclosed by the entire course of conduct, are essential elements of domicile.[34]

Though facts exist which establish that Orso took up a temporary partial residence in Alabama, it is clear to this court that Canfield has not met her burden of proving that the Debtor changed his domicile from Louisiana to Alabama in March of 1994 or thereafter. She has failed to establish

that during the 180–day period prior to the Debtor's filing of bankruptcy, Orso was domiciled in Alabama, or domiciled there for longer than at any other location.

Prior to his move to Alabama, the Debtor's domicile clearly was Baton Rouge, Louisiana, as this was the parish in which he had his "principal establishment," i.e., that in which he made his "habitual residence." [35] Indeed, although the Debtor was born in Alabama, he lived most of his life and grew up in Louisiana, and most, if not all, of his major life events occurred in Louisiana: he went to school in Louisiana, he made significant friendships in Louisiana, he married in Louisiana, the accident which permanently damaged his brain and caused him to be unable to formulate future plans or direction occurred in Louisiana, he separated and divorced in Louisiana, and, for a number of years (until just after the state court's ruling in favor of Canfield), he (along with help from a childhood friend, his mother, and (finally) a girlfriend) attempted to construct a world within which he could operate.

By moving to Alabama, did the Debtor change his domicile from Louisiana to Alabama with the intent to make his principal establishment in Alabama? [36] Because the Debtor did not expressly declare that he intended to make his principal establishment in Alabama,[37] the proof of his intent depends upon circumstances.[38]

The circumstances of the Debtor's life prior to the filing of this bankruptcy case clearly militate against this court finding that by moving to Alabama the Debtor changed his

**27.** *See Texana Oil & Refining Co. v. Belchic*, 150 La. 88, 90 So. 522 (1922); *George v. George*, 143 La. 1032, 79 So. 832 (1918); *Ballard v. Puleston*, 113 La. 235, 36 So. 951 (1904).

**28.** *See Sheets v. Sheets*, 612 So.2d 842 (La.Ct. App.1st Cir.1992).

**29.** *See LaFleur v. Seaboard Fire & Marine Insurance Co.*, 296 So.2d 860 (La.Ct.App.3rd Cir. 1974), *writ ref'd*, 300 So.2d 185 (La.1974).

**30.** *See In re Kennedy*, 357 So.2d 905 (La.Ct. App.2d Cir.1978).

**31.** *See Burke v. Mass. Bonding & Ins. Co.*, 19 So.2d 647 (La.Ct.App.1st Cir.1944), *aff'd*, 209 La. 495, 24 So.2d 875 (La.1946).

**32.** *See Successions of Rhea*, 227 La. 214, 78 So.2d 838, 844 (1955).

**33.** *Id.*

**34.** *See Stine v. Moore*, 213 F.2d 446, 448 (5th Cir.1954).

**35.** *See* La. Civ.Code art. 38.

**36.** *See* La. Civ.Code art. 41.

**37.** *See* La. Civ.Code art. 42.

**38.** *See* La. Civ.Code art. 43.

domicile from Louisiana to Alabama, with the intent to make Alabama his principal establishment. Given the Debtor's I.Q. of less than seventy, his inability to concentrate, his memory deficits, and his "flight of ideas," it is impossible for this court to find that the Debtor actually intended to change his domicile to Alabama. As the Debtor's mother testified at the hearing on this matter, and as Dr. Tessier testified in his deposition,[39] since the accident the Debtor has been "flighty," choosing one day to do one thing, and the next day to do something entirely different, with seemingly no continuity to the Debtor's thoughts. Such characteristic "flight of ideas" hardly evidences a studied intention on the part of the Debtor to abandon Louisiana, the only "home" he ever had known, especially given the Debtor's virtual inability to function without structure.

Moreover, as the Debtor's mother stated in the § 341(a) meeting[40] and at trial, the Debtor moved to Alabama to visit his relatives and to escape from painful memories brought to the surface by the judicial proceedings against him in state court. This comment suggests that the Debtor's motive for moving was the remote hope that life would be better in Alabama—that Alabama would be, as it were, a "vacation" from the stark realities of his shattered life in Louisiana, rather than an intention permanently to leave Louisiana and to establish his principal residence in Alabama. Moreover, that the Debtor opened a bank account in Alabama, obtained an Alabama driver's license, and transferred his car registration and car insurance to Alabama, evidences not an intent to establish his principal establishment in Alabama, but rather merely evidences that in order to function responsibly in that state and to pay his bills, he needed ready access to money and liability coverage for his vehicle.

The Debtor's continuing contacts with Louisiana also prove that he did not intend to make his principal establishment in Alabama. The Debtor returned to Louisiana *every* weekend to visit and stay with his childhood buddy Wayne, who lived in the very neighborhood in which the Debtor grew up. The Debtor occasionally dated women in Louisiana,[41] and finally settled into a serious, or at least longer lasting, relationship with a woman named Tammy, who he visited and with whom he stayed on the weekends. The Debtor also visited his brother every weekend in Louisiana, but his brother worked such long hours that it was difficult for the Debtor to spend much time with him. In addition, the Debtor received all medical care in Louisiana, got his glasses fixed at his old optometrist's office, continued to maintain his truck in Louisiana at the old mechanic's station, and maintained all his major bank accounts in Louisiana. In other words, the Debtor continued to return to Louisiana because the Debtor *never really intended to leave Louisiana*—Louisiana was what he knew as "home," and given his inordinate need for structured daily living, he was desperate to cling to what was familiar to him in a world which, post-accident, suddenly was confusing, frustrating, and frightening. Finally, we cannot lose sight of the fact of the 1992 interdiction proceeding, which was conducted by a Louisiana state court and which has never been modified. The debtor's mother is domiciled in Louisiana. Clearly, the bulk of the Debtor's assets has always been in Louisiana.

There is no evidence of any sort of evolutionary process going on from which the

---

39. *See* Deposition of Dr. Tessier, at 16.

40. January 26, 1995, § 341(a) meeting of creditors, at 26–27. Due to the interdiction of the Debtor, his mother (his curator) testified as or for the Debtor at the meeting of creditors, without objection from anyone.

41. The Debtor's mother testified at trial, however, that none of the Debtor's relationships with women were serious because the Debtor's ability to relate to others had been seriously impaired as a result of the accident. Because of his impaired relational ability, the Debtor jumped from one relationship to another without much thought.

Dr. Strobach also testified in his deposition that the Debtor's ability to relate to others had been severely impaired, and that although the Debtor's "girlfriends" made the Debtor smile and look happy, his cognitive deficits due to the brain damage itself would not have improved, despite his smile and his happy demeanor. *See* Deposition of Dr. Strobach Deposition, at 10, 16, 18–19. Dr. Tessier similarly testified in his deposition that the Debtor had a "flight of ideas." *See* Deposition of Dr. Tessier, at 11.

court could conclude that the Debtor was taking steps to obtain a more permanent connection with Alabama. As the court stated at the close of evidence presented on the domicile issue, what the Debtor came back to every weekend (and more) was a place five doors down from where he grew up, to a woman he might want to marry someday, to the familiar providers of services for himself and his possessions. He was like someone going off to college without the college. The drive to Alabama and the drive back was a structured activity he could do—so was going to the gym in Alabama. Other than going to the gym, paying a few bills, visiting with family some, what the Debtor did in Alabama was get ready to come home (probably without much thought as to what might happen when Wayne might not have the time for him). The home that Louisiana presented afforded the Debtor the opportunity to venture out, but like a fly on a string.

For these reasons, the court therefore finds that the Debtor's domicile was Louisiana during the entirety of the 180 days prior to bankruptcy for the purpose of determining the exemption law applicable to him.[42]

## II. The Louisiana Law of Exemptions And Annuities; Is *Matter of Young* The Haven Canfield Thinks It Is?

Canfield, who probably would have been satisfied with a finding of Alabama domicile (given the annuity limitation), now urges the application of *Matter of Young*, 806 F.2d 1303 (5th Cir.1987) as the controlling interpretation of the Louisiana exemption of annuity payments. She thereby urges that Louisiana is an even more fruitful ground for the objection, as the consequence of Louisiana domicile is no exemption at all. The

Canfield position can be simply stated. *Young* involved payment of money generated by a tort settlement to a payee by means of annuity policies. Orso involves the payment of money generated by a tort settlement to a payee by means of annuity policies. Both payees subsequently filed chapter 7 bankruptcy. The Fifth Circuit concluded that the payments due Young were "actually" in the nature of "accounts receivable" as opposed to annuity payments or policies (having courageously pierced through the veil of what the annuity policies actually were to achieve the more important knowledge of the true nature of the annuity policies, that is that they were or represented accounts receivable, and were therefore (here is the step that this slow-footed court missed) clearly not exempt).[43] Likewise, says Canfield, the annuity policies, or the payments due therefrom to Orso, are clearly not exempt.

### A. *Matter of Young;* An Analysis

#### 1. The Decision

*Matter of Young*, 806 F.2d 1303 (5th Cir. 1987), is cited by Canfield for the proposition that the Debtor's Tort Settlement proceeds are merely accounts receivable which are property of the estate and are not exempt under La. R.S. 22:647. Indeed, *Matter of Young*, at first blush, might appear to be a formidable obstacle for the Debtor to overcome.

In *Young*, a Chapter 7 case, the Fifth Circuit affirmed the district and bankruptcy courts' judgments that attorney's fees payable to the injured party's attorney in the form of an annuity were not exempt under La. R.S. 22:647 and 20:33 [44] as proceeds from

---

42. Because of this conclusion, it is unnecessary to investigate whether, if Alabama law applied, Canfield would be able to take advantage of the generally applicable exemption limitation of § 27–14–32 of the Alabama Code or whether, given Orso's inability to care for himself, now or ever, and the advancing age of his parents (curator and undercurator), the court would use its discretion to ignore the cap, as provided in § 27–14–32(3).

43. As we shall see, the Louisiana state court which has dealt with this precise question acknowledges that exemption of this type of annuity might create an undesirable loophole (depend-

ing, of course, upon one's perspective), but that courts are to interpret the law as written, not to carve out artificial distinctions that might feel better.

44. In La. R.S. 20:33, Louisiana sets forth an additional exemption of annuity policies or plans, which arguably limits the claim of exemption for annuities to those emanating from an employment plan.

The following shall be exempt from all liability for any debt except alimony and child support: (1) All pensions, all proceeds of and payments under annuity policies or plans, all individual retirement accounts, all Keogh plans, all sim-

an "annuity," but remained part of the bankruptcy estate. The Court in *Young* was dealing with an underlying agreement on the part of the settling defendant (and, one supposes, the plaintiff-client) that the portion of the settlement amount payable as a contingency fee by the plaintiff-client to the attorney be carved out of the structured settlement to the client and, instead of flowing through an annuity to the injured party, be separately paid, through a separate annuity, to the lawyer. Rather than take the fee as a lump sum percentage of the client's award, the attorney became the annuitant under an annuity policy issued by a company of the settling party's choosing (probably subject to approval by the hurt person and lawyer). From the defendant's perspective there was no difference between the lawyer and the hurt person, though the initial obligor to the lawyer was the client whom the lawyer had represented in the prosecution of the personal injury action and settlement of the claim.

Subsequently the lawyer filed a Chapter 7 bankruptcy case. He then claimed his right to payments under the annuity contract as exempt under La. R.S. 30:33 and La. R.S. 22:647.[45]

With the only reference to Louisiana law being the reprinting of the exemption statutes at issue, the Court posed as its question: "Whether the present payments are exempt under 20:33 and/or 22:647 as proceeds from an 'annuity' or are part of the estate as accounts receivable." 806 F.2d at 1306. Citing *Black's Law Dictionary* and a Texas bankruptcy case,[46] the Court concluded that "While the payments ... are, strictly speaking, an 'annuity', they are also accounts receivable." *Id.* Without revealing the source of its commission to do so, the Court designated its quest: "We must, therefore, pierce the veil of this arrangement to determine its true nature." [47] *Id.*

The Court relied upon a **Pennsylvania** state court decision. Commonwealth v. *Beisel*, 338 Pa. 519, 13 A.2d 419 (1940), as providing "some instructive words on the difference between an annuity and an account receivable." *Id.* at 1306. The Pennsylvania court is cited as concluding:

Its determining characteristic is that the annuitant has an interest only in the payments themselves and not in any principal fund or source from which they may be derived. The purchaser of an annuity sur-

---

plified employee pension plans, and all other plans qualified under Sections 401 or 408 of the Internal Revenue Code. However, an individual retirement account, Keogh plan, simplified employee pension plan, or other qualified plan is only exempt to the extent that contributions thereto were exempt from federal income taxation at the time of contribution, plus interest or dividends that have accrued thereon. No contribution shall be exempt if made less that one calendar year from the date of filing for bankruptcy, whether voluntary or involuntarily, or less than one calendar year from the date writs of seizure are filed against such account or plan.

(2) All gratuitous payments made by employers to their employees or former employees, or to the widow, or heirs, or beneficiaries of their employees or former employees, whether such payments are made in consideration of the length of service rendered by the employee, his age, death, or otherwise.

La. R.S. 20:33 (1995).

Similarly, La. R.S. 3881 sets forth Louisiana's *general* exemptions from seizure. Subsection (D) of this provision mirrors La. R.S. 20:33 and provides as follows:

D. (1) The following shall be exempt from all liability for any debt except alimony and child support: all pensions, all proceeds of

and payments under annuity policies or plans, all individual retirement accounts, all Keogh plans, all simplified employee pension plans, and all other plans qualified under Sections 401 or 408 of the Internal Revenue Code. However, an individual retirement account, Keogh plan, simplified employee pension plan, or other qualified plan is only exempt to the extent that contributions thereto were exempt from federal income taxation at the time of contribution, plus interest or dividends that have accrued thereon.

(2) No contribution shall be exempt if made less than one calendar year from the date of filing for bankruptcy, whether voluntary or involuntary, or less than one calendar year from the date writs of seizure are filed against such account or plan.

La. R.S. 13:3881(D).

**45.** Orso does not claim an exemption under La. R.S. 20:33, only under 20:647.

**46.** *In re Howerton*, 21 B.R. 621, 623 (Bankr. N.D.Tex.1982).

**47.** This description is curious in light of the Court's prior pronouncement that the payments were an annuity and also accounts receivable.

renders all right and title in and to the money he pays for it. On the other hand, where a debtor agrees to pay his creditor in installments at regular intervals, the debt or principal sum itself is due to the creditor although payable only in the manner agreed upon; it is an account receivable in which he has a property interest. Therefore, installment payments of a debt, or payments of interest on a debt, do not constitute an annuity.

*Young*, 806 F.2d at 1307. The court grounds its reliance upon the *Beisel* case upon its inability "to find any court that has identified the exact point at which an account receivable becomes an annuity deserving exemption under Louisiana law." *Id.* at 1306.[48]

On the basis of the characterization of its quest, the court, embracing the lower court's delineation between accounts receivable and annuities, has no difficulty reaching its conclusion.

> It is the substance of the arrangement rather than the label affixed to it that determines whether the payments are exempt under the Louisiana statutes as proceeds from an annuity, or accounts receivable, and part of the bankruptcy estate.[49] The $155,196 that made up the principal of the "annuity" was part of the payment Debtor received for services rendered ... in 1982. Young [the debtor], as creditor, elected to receive his fees in regular monthly payments over a fourteen year period. It appears, then, that the monthly payments made to Young represent nothing more than installment payments on debts to cover the attorney's fees owed [him]. Yet, if Young had accepted the total fees in 1982, paid taxes on the income and then purchased an annuity policy with the remainder, the payments clearly would

be exempt, since he would have transferred his interest in the funds as consideration for the periodic payments he was to receive. The important factual distinction between this scenario and the present case was explained by the bankruptcy court in this case as follows:

> In the present case, the Underwriters paid a single premium of $155,196.00 to Sullivan in consideration for the annuity policy which would pay the Underwriter's monthly obligation of $1,875.00 to the Debtor. *The Debtor, however, retains an interest in the principal debt which the Underwriters owe him in monthly installments....* Thus the Debtor has an interest in not just the payments under the annuity, but in a larger sense also in the principal fund or source—the installment debt owed him by the Underwriters—just as if he had left the money with the Underwriters and agreed to accept payment in installments. [Emphasis added.]

Under the tort settlement agreement, as each monthly payment is made it reduces by a proportionate amount the underwriters' debt. Young, therefore, retains a right against the underwriters to the remaining principal until the debt is fully extinguished after fourteen years. Retaining such a right renders the so-called annuity, in substance, nothing more than an account receivable, and not exempt from the bankruptcy estate.

*Id.* at 1306–07 (emphasis supplied). According to the Court, then, because the debtor retained a claim against the party who had purchased the annuity policy, to the extent of the amounts yet unpaid by the annuity, the annuity and payments thereunder lose their character as annuity policy payments, and

---

**48.** In using this inability to find such state law explanation as the reason for resorting to an interpretation of the personal property tax statute of Pennsylvania, the court ignores the possibility that there need not be such an explanation, for exemption purposes, if an account receivable changes form by being deposited pursuant to an annuity contract. Further, the fact that there is no Louisiana authority on the issue posed by the court conceivably is a reflection upon the relevance (or lack of relevance) of the issue, itself.

**49.** This Court has looked in vain for Louisiana authority as to this proposition, presumed by the court. Of course, one could argue that while the snappy recitation sounds like the espousal of a penetrating legal proposition, it could be that the court is saying nothing more that "calling a giraffe a duck does not make a giraffe a duck." Now, while this may be true, is it also true that a giraffe who is, in fact, a giraffe, but who is also a wallflower (at parties) is truly a wallflower, and no longer a giraffe?

are truly to be seen as accounts receivable, *and thereby as non-exempt.* (Also, the Court reveals something of an axe to grind with Young, for limiting his tax- liability through the payment stream and at the same time, attempting to convert exempt property to non-exempt property (perhaps worth noting is the fact that two years elapsed between the issuance of the annuity policy and the chapter 7 petition)).

So, let's back up. The Court can find no case from Louisiana determining the point at which an annuity becomes an account receivable, so it must look to the decisions of other state courts. However, the only authority for the proposition that a contract which is an annuity might also and therefore in reality be an account receivable is **this one other state court decision.** This is circular bootstrapping: The Louisiana inquiry is the question of whether an annuity is in reality an account receivable ("It is the substance of the arrangement rather than the label affixed to it that determines whether the payments are exempt under the Louisiana statutes as proceeds from an annuity, or accounts receivable, and part of the bankruptcy estate." 806 F.2d at 1306), because a Pennsylvania state court has invoked such an inquiry in the past. Because there are no Louisiana cases that have opined on the question that the Court says they should have (because a Pennsylvania court did once), resort must be had, therefore, to the Pennsylvania case for its analytical approach in determining whether an annuity is an account receivable, because Louisiana law, having been directed by Pennsylvania law as to the ultimate question, must yield to Pennsylvania law as to how to get to the answer.

In other words, the Fifth Circuit, whose charge is the interpretation of Louisiana state law, concludes that the Louisiana courts would look to Pennsylvania law as providing the ultimate question and the reasoning by which it is answered, notwithstanding that not one Louisiana case or statute relating to statutory interpretation is mentioned, no Louisiana case or statute concerning the

state law of exemptions is mentioned (except that the statutes upon which the debtor claimed his exemption are quoted, to show the statutory basis for the claimed exemption), and finally, no Louisiana case or statute is cited that would provide authority for the proposition that any other state law should be resorted to.[50]

It gets worse. When one looks behind the cited language of the Pennsylvania state case and obtains understanding of just what the court in Pennsylvania was dealing with, the Fifth Circuit's resort to the case for any reason whatsoever (much less as the be-all and end-all on a Louisiana exemption question) is inexplicable.

2. *Commonwealth v. Beisel,* The Law Of Pennsylvania, And Even A Few More Pennsylvania State Court Cases (A Lesson In Irrelevance)

The *Beisel* case involved two life insurance policies, the proceeds from which were payable to the decedent's beneficiary. Rather than obtaining the proceeds of the policies in lump sums, the beneficiary exercised an option contained within the policies to be paid a monthly payment, together with a contractual interest factor, until the proceeds were exhausted. The Secretary of Revenue assessed the payments under the State Personal Property Tax Act as taxable annuities. 338 Pa. at 520, 13 A.2d 419. The Court of Common Pleas reversed the Secretary, and the Commonwealth of Pennsylvania appealed to the Supreme Court. On appeal, the Commonwealth argued that, in substance, the agreement by the beneficiary to allow the insurance companies to hold the proceeds subject to the monthly obligations constituted annuity contracts, taxable under state law. The Supreme Court denied this interpretation within the context of the question of whether the contracts were taxable annuities under state law.

Under the state law at issue, Pa.Stat.Ann. 72 § 3244, a millage tax was imposed upon:

All personal property of the classes hereinafter enumerated, owned, held or possessed by any resident, whether such

---

50. Why are no Louisiana statutes or cases mentioned? Other than that there are none which remotely stand for the proposition that the court must determine what it says it must determine, we have no idea.

personal property be owned, held or possessed by such resident in his own right, or as active trustee, agent, attorney-in-fact, or by any resident as trustee, agent or attorney-in-fact, jointly with one or more trustees, agents or attorneys-in-fact domiciled in another state where such personal property is held and managed in this Commonwealth, or in any other capacity, ... and where such resident is entitled to receive all or any party of the income therefrom, is hereby made taxable, annually, for State purposes, at the rate of four mills on each dollar of the value thereof, as of a date to be fixed annually, in the manner provided in section five of this act, and no failure to assess or return the same shall discharge such owner or holder thereof from liability therefor; that is to say,—All mortgages; all moneys owing by solvent debtors, whether by promissory note, or penal or single bill, bond or judgment; all articles of agreement and accounts bearing interest; ... all other moneyed capital owing to individual citizens of the State; and **the principal value of all annuities ...**

(footnotes omitted; emphasis supplied).

Though not expressly stated, the Secretary of Revenue was attempting to tax the proceeds of the policies under the "principal value of all annuities" section of the statute. The problem, from the Secretary of Revenue's standpoint, was that the proceeds of insurance policies were not subject to the tax imposed, 338 Pa. at 521, 13 A.2d 419, so it was apparently important to classify the proceeds differently, as payments from annuities, for example, from a taxability standpoint.[51] The court differs with the Commonwealth's analysis, which was that leaving the proceeds with the company was tantamount to having contracted for an annuity after the insurance proceeds became payable. The court focuses upon the absence of an annuity contract.

> But the difference between the hypothetical and the actual case is that, in the former, defendant transfers her interest in and to the funds as consideration for the periodic payments which she is purchasing, whereas, in the latter, she retains ownership of, and interest in, the principal of the debt which is due to her, just as if she had left the money with the companies on deposit, and she merely agrees to accept payment thereof in installments. **The form of the transaction is of vital importance in determining whether its intention is to pass title to the fund or obligation from which the payments emerge.**

*Id.* at 522, 13 A.2d 419 (emphasis supplied).[52] Therefore, the question of whether the proceeds from the life insurance policies, voluntarily left on deposit with the insurance company, became the principal value of an annuity for personal property tax purposes was answered "no."

This conclusion is grounded upon the decision, *Keiper v. United Zion Home,* 108 Pa.Super. 28, 164 A. 367 (1933). In *Keiper,* the court was faced with a claim by Keiper's estate to funds "placed" by him with the United Zion Home, pursuant to a "paper" providing for semi-annual payments (of interest) to Keiper and the right of Keiper to

---

**51.** Some minor amendments have immaterially affected the statute since 1940. The importance, to the Secretary of Revenue, of reclassifying the proceeds, as well as the taxable objective under the Personal Property Tax Act, is evidenced by a prior lower court decision, *Appeal of Duvall,* 33 D. & C. 238, 86 P.L.S.1939. In this case a beneficiary had no option under the policy but to surrender the policy of insurance and thereafter take a monthly income for the balance of her life (and, if she died prior to her life expectance, the balance of the fund would be paid to others). The court held that the payments were made under a policy of insurance as opposed to an annuity and, therefore, that the capitalized value was not subject to the personal property tax.

See also, *Com. v. Benshoff,* 44 Pa. D. & C. 630, 90 P.L.J. 145, 55 York 205 (1942).

In light of the argument raised by the Secretary in *Beisel,* as seen through the spectrum of these decisions, the tax statute functioned to impose a millage tax upon the discounted principal value of the annuity payment stream, if the right to receive payments could be classified as an "annuity."

**52.** Remember, this is the case which establishes (for no other case has referred to) that it "is the substance of the arrangement rather than the label affixed to it that determines whether the payments are exempt under the Louisiana statutes."

receive lump sum payments as needed for his maintenance. As of his death, the home had retained the $2,000 that Keiper had claimed entitlement to, and claimed that Keiper had retained no interest in the principal fund. The court concluded that the "paper" did not meet the form requirements of a gift, and was therefore faced with the argument that the "paper" constituted an annuity which had substituted for Keiper's ownership in the fund the obligation to make the called-for payments (only) during Keiper's lifetime.

The Court concludes that the "paper" was not an annuity contract, as follows:

> It cannot be construed, from its terms, as an annuity contract, under which Keiper parted with the title and property in the money paid by him, in consideration of the semiannual payments made to him by the home during his life; for it contains no words evidencing an intention on Keiper's part to transfer the property in the fund to the home; and the conduct of the parties negatived any such construction, for, when he demanded $500 back out of the $2,500 which the home had received from him, it was paid, a course wholly inconsistent with an annuity contract.

164 A. at 368. The *Keiper* court interprets the contract, and provides the *Beisel* court with the fundamental component of the makeup of the annuity, under Pennsylvania law: purchase of an annuity contract causes the transfer of ownership or control of property in return for property of a different type, the right to receive the payments as provided by the annuity contract. The original sum of money is no longer under the control of the prior owner of the money, as the annuity issuer now has complete dominion and control *over the dollars previously owned and controlled by the annuity purchaser,* but owes the annuity payment stream as set forth in the contract. For the *Beisel* court, the difference is no more than the difference between having a right to a fund left on deposit, but agreeing to receive payments of that fund according to agreed terms (which would not constitute a transfer of the fund itself, the entirety of which would, for example, be payable to the payee's estate upon death). The court is suggesting only that the annuity is a particular type of property, like cash is particular, like a house is particular, like a promissory note is particular; and as such, for taxation purposes (and for residual ownership of the original fund purposes—*see Keiper*), the matter of form is controlling.

However, for what it's worth, the *Beisel* court went on to find that the taxpayer had won a Pyrrhic victory, finding that the beneficiary's agreement to leave the money with the companies, subject to an interest and monthly payment obligation, changed the nature of the life insurance proceeds to an "account bearing interest", "... an investment which is taxable, irrespective of the source from which they were derived." *Beisel,* 338 Pa. at 523, 13 A.2d 419. Essentially, the distinction discerned by the court amounted to a distinction without difference, for the result—the fund was taxable—would have been the same, regardless of classification of the arrangement as an annuity or account bearing interest.[53] The court reversed the lower court, reinstating the assessments.

Subsequently, an apologetic Pennsylvania Supreme Court relied on *Beisel* to affirm an assessment made upon a fund of life insurance proceeds left with the insurance company pursuant to an option contained within the policy. *In Commonwealth v. Myers,* 348 Pa. 90, 34 A.2d 69 (1943), the court all but bemoaned the prior decision ("We have read with great interest the brief of appellant, and if this matter had not been passed upon by our Supreme Court, we might have been inclined to take the view and vacated." 348 Pa. at 92, 34 A.2d 69). In *Myers* the court makes clear that the import of classification as an account bearing interest in great measure interferes with the inner workings of policies of insurance, which had obtained a

---

**53.** The cases referred to within footnote 51 above would limit the applicability of *Beisel* to situations where the beneficiary voluntarily exercised an option to leave the proceeds with the company in return for an agreed-upon monthly payment obligation (with the principal bearing interest), as opposed to being forced by the terms of the policy to take the insurance proceeds through a payment stream.

newfound importance among the populace ("life insurance has grown very rapidly and today nearly every individual carries insurance in some form." 348 Pa. at 94, 34 A.2d 69). Notwithstanding the deleterious effect upon the interests of beneficiaries, the court was compelled, it said, to follow *Beisel.*

So, from all of this, what is to be gleaned? In the State of Pennsylvania, as of 1940, the Secretary of Revenue had attempted, on a number of occasions, to impose personal property millage tax on insurance proceeds held by insurance companies under the tax statute providing for such millage tax upon the principal value of annuities. As evidenced by the cited unpublished opinions (see footnote 51), these attempts had failed in situations where the beneficiary had no option under the policies but to "leave the money up" and receive a payment stream, with interest, from the company which had issued the policies and owed the proceeds. If this type of policy appears to the modernized to be a bit arcane, it was. The Pennsylvania courts recognize that the life insurance industry is emerging from its embryonic beginnings.

In connection with what might have been a new wrinkle within the developing insurance industry, policies providing that proceeds payable upon death could be voluntarily left with the insurance company to be paid out over time with interest. The Pennsylvania Secretary of Revenue attempted to carve an exception to the "proceeds are insurance if the beneficiary has no choice" line of cases. The Secretary, sticking with what **had not up until then worked,** asserted the "taxable as an annuity" approach upon proceeds voluntarily left with the insurance company, again to no avail. Why? As mentioned, **there was no annuity contract.** The proceeds dealt with in the *Beisel* case were not both an annuity and an account bearing interest. The Supreme Court, because of the framing of the issue by the Secretary, was faced with the question of whether otherwise non-taxable insurance proceeds changed in nature to a taxable annuity solely on the basis of this newly devised arrangement and without an annuity contract.

What is clear from the *Beisel* decision is that the question of whether the payment obligation constituted an annuity was a question that the court did not need to address. By finding that the obligation of the insurance company was taxable as an account bearing interest the court determined that, the entire value of the account formed the value upon which the tax was computed, which should not have differed from the capitalized value of the payment stream if found to be an annuity. The effect of the *Beisel* and *Myers* decisions was to limit the types of insurance proceeds payment methods that could escape personal property taxation.

The issue was whether a personal property tax statute was applicable to a fund of money. Three choices: (1) no, because the proceeds were payable as a policy of insurance; (2) yes, because the **proceeds changed in nature,** without an annuity contract, to an annuity; (3) yes, because the proceeds constituted **an investment** which constituted (under the Pennsylvania personal property tax statute) "an account bearing interest." The inquiry was made necessary because there was no annuity contract and because of prior jurisprudence allowing insurance proceeds to retain their tax-exempt status.

There was no issue of exemption from seizure. There was no statute approximating in scope or purpose the Louisiana exemption statute. There was no definition of account receivable referred to by the court other than the general proposition that an account receivable is an obligation to pay a debt so that the insurance company obligation could be classified as "an account bearing interest" under the **personal property tax statute.** Finally, given the outcome of *Beisel,* there is no doubt that the distinction between an annuity and account bearing interest was unnecessarily drawn; notwithstanding losing on the annuity issue, the Secretary's assessments were upheld on the basis of the account classification. Therefore, the annuity discussion is clearly dicta, unnecessarily explored by the Pennsylvania Supreme Court (probably as an attempt to prod the legislature into amendment, as *Myers* most certainly was).

That nothing about the issues raised and dealt with by *Beisel* was mentioned by the *Young* court is difficult to understand. More difficult to understand is how a federal circuit court, in interpreting Louisiana law, can develop its charge from a Pennsylvania state court which dealt with an utterly unrelated issue in a way that it did not have to. Even more difficult to understand is how the *Young* court could fail to consider **at least worth of mention Louisiana exemptions law, the Louisiana definition of accounts receivable, Louisiana law on the modes of basic statutory interpretation, and Louisiana law on annuities** (though, as will be shown, such a focus would definitely have impeded progress on its charge).

Further, and maybe this means finally, it is this court's opinion that in addition to the court having erroneously resorted to *Beisel* for its ultimate conclusion and the analysis by which it could be reached, the Fifth Circuit misread *Beisel* as standing for the proposition that an annuity contract will not be an annuity contract if it also constitutes an account receivable. In fact, the *Beisel* court, if it was dealing with an actual annuity contract, would never ask the question. Because both would be taxable, one can envision the *Beisel* court concluding as follows: This Court need not determine whether the annuity contract loses its status as an annuity if it is also an account receivable (or is the mechanism by which an account receivable is to be paid), as either the annuity or the account bearing interest is subject to the millage tax under the statute. However, the conclusion that without an annuity contract an account receivable does not turn into an annuity **does not require the conclusion that an annuity contract loses its status as an annuity because it is utilized as the method to satisfy an account receivable.** What *Beisel* does say is that to constitute an annuity contract, the purchaser must transfer certain dollars (or a fund) to the seller (of the annuity contract) as a consideration for the annuity contract. If this is done, the purchaser transfers ownership of these dollars (or fund) and gets something else—the annuity contract.

Without the purchase and sale of the annuity contract, the principal fund (the exact dollars) remains the property of the erstwhile "purchaser." Upon the death of the "purchaser" (more properly referred to as investor or depositor), the fund itself is part of the decedent's estate. *See Keiper.* Remarkably, as we shall see, this requirement that a fund be transferred to the seller of the annuity is a requirement of the Louisiana annuity. Clearly, under both *Beisel* and Louisiana law, if the purchaser of the annuity is someone different from the annuitant (or beneficiary, or payee), and the basis for the purchase of the annuity is an obligation to the annuitant (or beneficiary, or payee), the annuity does not evaporate or lose its nature on this account.

### 3. Back To *Young* For Further Discussion

We see that the Fifth Circuit assumes the need to choose between annuity and account receivable, though it can point to no Louisiana law directing it thus. If we look to the District Court opinion, 64 B.R. 611 (E.D.La. 1986), we see the source of this misconception. The District Court unabashedly makes up the inquiry. "However, before the court can determine whether the payments are subject to exemption under sec. 20:33 and/or sec. 22:647, it has to be determined whether the monthly payments are annuity payments or account receivables." 64 B.R. at 614. We have attempted to show that both *Young* courts presumed an inquiry that was not necessary. Let us go a bit further and look into the actual arrangement underlying *Young* to see if we can, with the Courts' own focus, set up the proper analysis.

Recall that Mr. Young was a lawyer, who chose to have his fee paid by means of an annuity policy. Now, the District Court at first blush could be seen as having found it important **that Young retained his claim against his former clients** in concluding that the substance of the transaction was an account receivable and not an annuity policy. "He has not relinquished his rights as a creditor to the sum owed by the Fanguys for services rendered. Therefore, since the debtor has not transferred his interest in and to the debt owed to him, the payment made in satisfaction of the debt amounts to an

account receivable." 64 B.R. at 615. However, closer reading of the case, and analysis of the Fifth Circuit's opinion, reveal that Young probably **did not retain a claim against the former clients, but rather exchanged it for a claim against the underwriter** *who purchased the annuity policy by means of one lump sum payment.* "Under the settlement agreement, as each monthly payment is made it reduces by a proportionate amount the underwriter's debt. Young, therefore, retains a right to the remaining principal until the debt is fully extinguished after fourteen years. Retaining such a right renders the so called annuity, in substance, nothing more than an account receivable and not exempt from the bankruptcy estate." *Young,* 806 F.2d at 1307.

So, the underwriter assumes the obligations of the defendants under the settlement agreement and, in accordance with the settlement agreement, purchases an annuity policy under which Young is the payee, with the underwriter being the owner of the annuity. Has Young relinquished his interest in anything? Well, it appears that Young has allowed an annuity to be purchased for him. As long as the annuity pays the sums so stated therein, Young has no recourse against anyone for the supposed debt. Both the district court and Fifth Circuit posit, bemoan, and reject the prospect of form over substance and firmly defend against capitulating to such niceties (as form).[54] However, is Young actually in any different position than if he had, himself purchased the annuity? This question can be approached from a couple of directions.

First, what if Mr. Young dies before the annuity policy pays out the payments due? His heirs do not want to wait for the remaining numbers of years and assert that, because the arrangement is nothing but an account receivable and Young is dead, the Young estate is now entitled to disregard the provisions of the annuity and be paid a lump sum equal to the remaining portion of the original purchase price of the annuity, along with an interest factor. If the annuity company will not so pay, the estate says, it will sue the underwriter (owner of the annuity) and leave the underwriter to sort out its claims, if any, against the company who issued the annuity. Based on the facts as recited, the heirs appear to lose, as what is owed is the payments as per the annuity. Can there be early resort to the underwriter? No. Resort to the client? No. What the succession gets, it appears, is the payment stream under an annuity policy (remember, the policy is owned by that underwriter), as the payment stream, itself, is what provided the value to Young. It would seem (and we will confirm this later when we look to Louisiana law) that the heirs have absolutely no right to the fund originally used to purchase the annuity. The estate's rights are limited by the policy.

Second, let us analyze what happens if the underwriter goes broke, files a liquidation under applicable state or federal law, and pays claims against it. Is there any doubt that Young dispenses with the filing of a claim against the underwriter? No. Even if a claim is filed, does Young receive anything on account of it? No. Finally, what if the annuity company quits paying, for whatever reason? It appears that Young would have at least two alternative courses of action. First, he probably has recourse against the annuity company, which, if the company has gone broke, would yield him little. However, he also has recourse against the underwriter who bought the annuity policy. His recourse is to require the underwriter either to obtain the money used to purchase the annuity and transfer it to him, or to require the underwriter to provide him a replacement for the remainder of the payment made to purchase the annuity.[55]

---

54. This resoluteness is curious, in light of the references to the *Beisel* court's preoccupation with the form of the arrangement: "The form of the transaction is crucial in determining whether payments are annuities and exempt under Louisiana statutes or account receivables and part of the bankruptcy estate. See *Beisel,* 13 A.2d at 421." 64 B.R. at 615. Of course, as mentioned some 130 times so far, *Beisel* did not deal with exemption issues.

55. As will be shown, this right tracks, exactly, the Civil Code's provisions regarding the rights of a person to whom an annuity is payable, and as well, tracks the Civil Code understanding of the basic structure of an annuity arrangement.

There is another approach, that suggested by both *Young* Courts—"Yet if Young had accepted the total fees in 1982, paid taxes on the income and then purchased an annuity policy with the remainder, the payments clearly would be exempt, since he would have transferred his interest in the funds as consideration for the periodic payments he was to receive." 806 F.2d at 1307 (citing 64 B.R. at 615). Superficially appealing. However, what the courts have done is carve out from the scope of exempt annuities any annuity purchased by an underwriter or agent on behalf of a client or annuitant, **and has limited the concept of the exempt annuity to policies purchased directly by the annuitant.** Why do we say this?

Think for a moment about how many annuity policies are purchased. Is it not conceivable that independent financial planners assist clients in the purchase of annuities? If so, what does the structure look like? In all likelihood, just like the *Young* arrangement, with minor modifications. Underwriters (the planners) discuss the various options, and if annuities are decided upon, take the client's money and with it purchase an annuity for the client. For this the planner is paid a fee by the client, and possibly also by the company issuing the annuity policy. So, the fund has gone from the client to the planner to the company issuing the annuity. Clearly, the client has relinquished control over the original dollars (known, in Young parlance, as the "fund"), as the funds have been used to purchase an annuity. Now, does the client retain any claim? What about a claim against the planner? Probably the client never thinks about this, but wouldn't it be possible that the client retains a claim **against the planner, in the event the annuity issuer ceases to pay according to the policy?** The planner has taken the fund, and has purchased an annuity, which is supposed to pay the client. If the issuer does not live up to the agreement, is the planner not responsible to the client to refund the fund? Maybe; maybe not, according to the arrangement.

Folding in another layer though, the *Young* courts are arguably saying that no payments or rights of an annuitant or benefi-ciary under annuity contracts will be exempt if the contract is purchased by a third person, if the third person has an obligation to the annuitant or beneficiary. We see the true limitations upon the exempt annuities imposed by the *Young* courts, through the use of following hypothetical illustrations:

1. Annuity purchased with client's money by an underwriter with the client as annuitant, and servicing a claim against the underwriter if the annuity company quits paying or goes broke. Not exempt, client retains claim against underwriter.

2. Husband uses community funds to purchase directly an annuity with wife as annuitant as part of agreement to partition community. Wife retains claim for one-half of community in the event annuity company fails to pay or goes broke. Not exempt; husband (and underwriter) remain liable for original claim.

3. Father purchases three annuities, one for each of his children, providing within a side agreement (with each) that, if the annuities fail to pay as required by the contracts or become insolvent, that annuitant will retain a claim against the father (and/or the father's estate) for a *pro rata* share of the value of the paying annuities. Not exempt. Retention of claim precludes exemption.

We need to stop here momentarily. This discussion of the incorrectness of the *Young* court's focus upon the claim against the Underwriter, reliance upon *Beisel,* indeed the four corners of its change (given that the facts included a contract found, actually, to be an annuity), is made necessary by Canfield's reliance upon it. Canfield rather joyously embraced the exclusion from coverage by (unlimited) La. R.S. 22:647(B), proclaiming that retention of a claim (any claim) against the Underwriter (Orso did under one; did not under the other) constitutes control of the fund used to purchase the annuity, as mandated by *Young.* However, this Court's conclusion does not require it to rule in favor of Orso by means of direct repudiation of *Young,* thereby requiring it to take the most frightening step of contradicting purported precedent. In fact, exclusion of the three above-mentioned examples from exempt status are not dictated by *Young* because the

claims retained are not, in reality, accounts receivable (as that term is defined within Louisiana law).[56] Recall that *Young* was an attorney, and the payments due under the annuities represented the payment of a preexisting claim which arose from services rendered. Therefore, the holding in *Young* is limited to situations wherein the claims retained by the beneficiary, payee, etc. against the underwriter are actually in the nature of claims for services rendered or goods purchased, or to claims that are "accounts receivable" as that term is defined/used in Louisiana law.

However, the Fifth Circuit's focus upon the claim, held by Young against the underwriter, makes it unclear to the world (see this proceeding, for example) whether it was the nature of the claim—for services rendered, which causes it to be an account receivable of the lawyer (as the term is defined by state law)—or the fact of the claim itself (recall that *Beisel*, upon which the Fifth Circuit relies, was not dealing with a claim that would fit the definition of account receivable under Louisiana law) that jettisoned Young's annuity from exempt status. If it is the fact of the claim, as opposed to the nature of the claim, then none of the annuities represented by the examples above could be exempt. In fact, only gratuitous annuities or self-settled annuities without any claim rights at all would qualify. In light of the unlimited exemption under the Louisiana statute, this, simply, cannot be.

What about *Young*? The only steps missing which distinguish *Young* from the foregoing examples are the initial transfer of the fund from the client to Young and the subsequent transfer from Young to the underwriter. Instead there was a constructive transfer from the client to Young and from Young to the underwriter. If these steps had actually, instead of constructively, been taken, the only difference would have been the tax consequences to Young; the residual rights against the underwriter would have looked exactly like they looked through-the-*Young*-looking-glass. In essence, then, the Courts

have penalized Young for obtaining the tax benefit of stretching out the payment stream when the overall structure of the annuity arrangement, notwithstanding the suggestions to the contrary, is exactly like it would have been had Young received the fee in a lump sum and thereafter had an underwriter purchase the same annuity (less the taxed portion). All in all, therefore, the problem in *Young* was not the right against the underwriter, but the fact that the transfers, being constructive in nature, provided Young the tax advantage of not having to report the income as paid in one lump sum. For this Young was denied the exemption.

## B. The Fifth Circuit Distinguishes *Young* By Means Of Shaky Grounds; *Matter of Walden*

In *Matter of Walden*, 12 F.3d 445 (5th Cir.1994), the Fifth Circuit purports to explain its reasoning in *Young*, as it struggles to find a way to distinguish it so as to be able to grant exempt status to a broader class of annuities than as suggested by *Young*. In *Walden*, the Fifth Circuit held that the creation of an annuity as a result of the tort settlement of litigation between an employer and a employee over a non-compete agreement (subsequently a Chapter 7 debtor) did not preclude the annuity from being exempt pursuant to a Texas exemption for "all money or benefits of any kind ... to be paid or rendered to the insured or any beneficiary ... under any plan or program of annuities in use by the employer." 12 F.3d at 449 (*quoting* Tex. Ins.Code art 21.22 (West Supp. 1994)). The litigation had arisen from the employment relationship and the employer's alleged breach of a noncompetition agreement, and the annuity payments represented the employer's obligations under the preexisting noncompetition agreement. The trustee, relying upon *Young*, had argued that the annuity was created pursuant to tort settlement of litigation and therefore was not a true "annuity," but merely an account receiv-

---

**56.** See discussion, *infra*. We think the Fifth Circuit is bound by the definition of "accounts receivable" under Louisiana law if it, improbably, would retain adherence to *Young*. As men-

tioned, *Young* does not refer to Louisiana law on this score, but we have concluded that in using the term "account receivable" it was using it within the context of its Louisiana definition.

able. The Fifth Circuit distinguished *Young* on these grounds:[57]

> *Young* is distinguishable in several respects. The most obvious distinction is that it dealt with Louisiana, not Texas, exemption statutes. Here, as noted, our interpretation is governed by Texas' well-settled policy of liberal construction. The litigation that was settled arose out of the employment relationship between GES [the employer] and Walden, including GES's alleged breach of the non-competition agreement. And, most important, the annuity payments . claimed to be exempt are not "accounts receivable" for services *already* performed by Walden. Rather, the annuity was purchased by GES for the purpose of obtaining a release of the liens securing its continuing (future) obligation—as well as to fund that obligation— to pay Walden $4,000 per month in exchange for his *continued* (future) compliance with his agreement not to compete. [footnote omitted]. We conclude, therefore, that the tort settlement agreement, which resolved Walden's suit against GES and authorized GES to substitute an annuity for the collateral securing its continuing obligation under the non-competition agreement, does not preclude the annuity from being exempt under [the Texas exemption statute]. Although the substitution of the annuity for the collateral was made possible by the tort settlement agreement, the annuity payments represent GES's obligations under the pre-existing non-competition agreement, the validity of which was simply reaffirmed by the tort settlement agreement.

*Walden,* 12 F.3d at 449–50. Close examination of *Walden,* however calls into question the distinguishment analysis, revealing a Court that is most uncomfortable with either *Young* or *Walden,* as the inconsistency between the two cases precludes the Court from being comfortable with both. The

Texas exemption statute is in fact limited in .scope compared to the Louisiana exemption statute, requiring the annuity to be from an employer (and doubtless meant to cover retirement annuities). Even if this peculiarity is ignored, the distinguishment doesn't work. Though Walden's annuity was a reaffirmation of a non-competition agreement, clearly the **annuity was,** according to the Court's own words, **given as collateral for the obligation under the non-competition agreement.** This means that the . principal obligation, the debt owed under the non-competition· agreement, remained in force, **secured by the ˙annuity policy.** This, of course, is but another way of saying that "as each monthly payment ˙is made it reduces by a proportionate amount the underwriter's debt. Young (and as well, Walden), therefore, retains a right against the underwriters to the remaining principal until the debt is fully extinguished...." 806 F.2d at 1307. ,

There can be no other conclusion. Walden is owed money (the purported distinction between debt owed for past acts and a debt owed for amounts that come due in the future is no distinction at all. While the obligation exists now, and covers future conduct, the payee is clearly not ·entitled to be paid the amounts due under·the non-competition agreement until, on a monthly basis, he has not competed. Therèfore, when each payment comes due, it is a payment on a debt for services—not competing—already rendered). The non-competition obligation is collateralized with an annuity. Every payment, made after a month of not competing,. reduces the debt under the overall . agreement. · Failure of the annuity policy to pay exposes the obligor to pay·the entirety of the obligation, as the collateral obligation is only ancillary to the principal obligation. As well, seen in this light, there can be no other conclusion than that the payments, due for

---

**57.** The court also distinguished *Daniels v. Pecan Valley Ranch, Inc.,* 831 S.W.2d 372 (Tex.Ct.App.– San Antonio 1992), *cert. denied,* 508 U.S. 965, 113 S.Ct. 2944, 124 L.Ed.2d 692 (1993), which held that payments made pursuant to an annuity contract issued by an insurance company to a personal injury victim, in settlement of a personal injury claim, were not exempt from garnish-ment by the victim's creditors, on the ground that "[t]hat case involved a personal injury structured settlement annuity that the annuitant claimed was exempt from garnishment.... The annuitant did not contend that it was an annuity as contemplated by [the Texas exemption statute]." *Walden,* 12 F.3d at 450 n. 9. ,

past services, are made by means of the annuity vehicle, though **Walden retains control over the claim against both the other party to the non-competition agreement, and the underwriter who purchased the annuity contract for the obligor under the non-competition agreement.**

In fact, then, Walden might have had even more control than Young of the claim, or fund. To have retained Walden's level of control, Young would have had to have maintained his claim against clients for the fees due in addition to the claim against the underwriter. We are not told that he did so.

 The Court's holding must then rest on its observations concerning the liberalized interpretation of Texas' exemption laws, a curious distinction, since Louisiana's interpretation of its exemption laws was never discussed by the *Young* Court (and is not revealed in *Walden,* either). Had Louisiana law (any Louisiana law) been reviewed in *Young* or *Walden,* the Fifth Circuit would have seen that Louisiana case law is clear that the *purpose* underlying the Louisiana exemption statutes is to provide for the subsistence, welfare, and "fresh start" of the debtor, to the end that his or her family will not be destitute and so that the debtor will not become a charge on the state. *Ward v. Turner,* 150 B.R. 378 (E.D.La.1993), *opinion after remand,* 176 B.R. 424 (E.D.La.1994), *appeal dismissed by Matter of Ward,* 66 F.3d 322 (5th Cir.1995); *In re Hendrick,* 45 B.R. 965 (Bankr.M.D.La.1985). Moreover, in construing the exemption laws, the intention of the lawmakers must be carried out and given a broad and liberal interpretation conducive to the purpose of exemption, to the end that the obvious purpose of the statute not be frustrated. *Young v. Geter,* 185 La. 709, 170 So. 240 (La.1936), *answers to certified questions conformed to,* 170 So. 410 (La.App. 1936); *Laurencic v. Jones,* 180 So.2d 803 (La.App. 4th Cir.1965); *Mounger v. Ferrell,* 11 So.2d 56 (La.App.2d Cir.1942). Therefore, whenever a claim to exemption can be brought within the purpose and intent of the language of the statutes by a fair and reasonable interpretation, the exemption will be allowed. *Young v. Geter, supra.* Perhaps this is not Texas, but the primary distinction being Texas versus Louisiana does not appear to hold water.

What the Court has revealed in *Walden* is its discomfort with *Young.* We wish that instead of conjuring, it would have admitted such.

From here we move to the actual law at issue, that of Louisiana.

### C. Louisiana Law on Exemptions and Annuities

1. The Statutes; Definition of "annuity" under Louisiana law.

Article 2793 of the Louisiana Civil Code defines an "annuity" as follows: "The contract of *annuity* is that by which one party delivers to another a sum of money, and agrees not to reclaim it so long as the receiver pays the rent agreed upon." La. Civ.Code art. 2793 (1995). Article 2794 provides: "This annuity may be either perpetual or for life." La. Civ.Code art. 2794 (1995). Article 2796 provides: "Constituted annuity[58] is es-

---

**58.** The term "constituted annuity" is not defined. The "annuity" is dealt with in "Title X—Of Rents and Annuities." While the annuity is conceptually seen as the rent of money, the Civil Code also refers to the rent of land—a contract whereby a seller transfers title to land to one who holds as owner, but who owes back to the seller, as rent, either a sum of money or some quantity of fruits of the land. Such contracts were, by statute, perpetual, and **essentially redeemable** (otherwise the contract was one of lease). See La. Civ.Code arts. 2778, 2779, 2780, 2788. The same **essentially redeemable language** is used in terms of the "constituted annuity." Redactor comment refers to the Code Napoleon. art. 1911 (1804) as the source authority for Article 2796. This provision read: "Annuity constituted in perpetuity is essentially redeemable." Also, Civil Code Article 2800, dealing with interest, mentions "The interest of the sums lent and arrears of **constituted and life annuity . . .**" This provision seems to delineate between the perpetual (or constituted) and life annuity. However, the redactor's comment to Article 2793 refers to Civ. Code art. 33 of the Code of 1808, the source of the present article, as having read: "Interest may be stipulated in consideration of a stock or fund of money which the lender agrees not to ask. **In such a case the loan goes by the appellation of constitution of an annuity or rent charge.**" So, statutorily it is unclear whether the term "constituted annuity" and the statutes employing it are limited to the perpetual annuity or are applicable to both forms of annuity referred to. Resolution of this interpretative problem is

sentially redeemable. The parties may only agree that the same shall not be redeemed prior to a time which can not exceed ten years, or without having warned the creditor a time before, which they shall limit." La. Civ.Code art. 2796 (1995). Article 2797 provides: "The debtor of a constituted annuity may be compelled to redeem the same: 1. If he ceases fulfilling his obligation during three years. 2. If he does not give to the lender the securities promised by the contract." La. Civ.Code art. 2797 (1995). Article 2798 provides: "If the debtor should fail, or be in a state of insolvency, the capital of the constituted annuity becomes exigible; but only up to the amount at which it is rated, according to the order of contribution amongst the creditors." La. Civ.Code art. 2798 (1995).

There is no additional statutory definition, are no additional statutory explications to be found within the Louisiana statutes. Clearly, therefore, the Louisiana statutory law does not establish the distinction between an annuity and an annuity that is also an account receivable.

2. The Louisiana State Court Case Law on the Definition of Annuities

What have the Louisiana Courts and the Federal Courts interpreting Louisiana law had to say about annuities?

In *Succession of Vidalat*, 155 La. 1005, 99 So. 801 (1924), the Louisiana Supreme Court was faced with a claim in a succession proceeding by the ex-wife of the decedent, to which one of the primary heirs objected. The basis of the claim was a writing, executed at the time of the divorce of the decedent and claimant, whereby the ex-wife was to be paid seven dollars ($7.00) per month during the remainder of her life. Apparently the payments were made for a time, but ceased upon the remarriage of the ex-wife. Some 12 years passed before the demand. The Court threw out the claim, failing to find consideration and concluding, also, that even if a contract had existed, the rights thereunder had prescribed on the passage of 10 years

from the last payment. Though no express argument is referred to, the Court adds: **"Nor has the alleged obligation any of the elements that constitute the contract of annuity as defined by article 2793 of the Civil Code. There was neither property nor a sum of money turned over to Vidalat by his divorced wife, and therefore nothing upon which to base the payment of rent."** Id., 99 So. at 802.

In *Succession of Cotton*, 172 La. 819, 135 So. 368, 370 (1931), the Louisiana Supreme Court dealt with a question of whether the terms of a will created inheritance tax consequences to be borne by the legatees. The will in question left the bulk of the testator's estate to a bank, to be held in trust for the purpose of paying to certain of the legatees payments out of the net income produced by the principal estate held by the bank. The legatees were assessed inheritance taxes based upon a valuation of the legacies according to a taxation statute then extant. According to the statute, "all property of every nature and kind included or embraced in any inheritance, legacy, or donation or gift made in contemplation of death ..." unless exempted was subject to the tax. 135 So. at 824. The amount of the tax varied "with the ... value of the inheritance, legacy, or donation ..." Id. 135 So. at 823. The legatees argued that the statute was designed to apply only to physical property having a fixed value as of the death of the testator, and that the rights to receive payments was of speculative value, was only a part of income, and therefore not subject to levy. According to the court, "A right to income, to be earned, left to one by a will, is property, and therefore comes within the provisions of the statute." Id. 135 So. at 824. Further, says the Court, the statute "provides a specific method of fixing the value of a legacy or donation...which consists in whole or in part of an annuity....**The bequest of money to be earned from the whole of a testator's estate, payable monthly or quarterly for life,**

---

not necessary here, as redemption rights are not at issue. Also, as will be shown, the jurisprudence has not limited the possible forms of the annuity to the two mentioned by statute, has not

attempted to discern whether redemption rights are limited to the perpetual annuity, and has, in fact, blessed as an annuity a contract having as its only limitation upon redemption (surrender

may be regarded as an annuity." *Id.* (Emphasis added.)

The legatees argued that the language of Civil Code Article 2793 contemplated a different type of arrangement, and that the language of the Code provided the exclusive means of confecting an annuity. The Court, while acknowledging the argument and the definition of an annuity set forth in Article 2793, concludes: **"However, this definition is, by no means, all-inclusive, and it is clear, from the context of section 23 of the act of 1921, that the legislature had no intention of being controlled by it, but used the word in a broader sense."** *Id.* 135 So. at 370.

In *Succession of Rabouin,* 201 La. 227, 9 So.2d 529 (1942), the Louisiana Supreme Court faced the question of whether contracts designated as "annuity policies" were annuities and therefore subject to the laws of forced heirship (i.e. were to be subject to the distribution limitations ) or were insurance, and therefore not so subject (on the basis that the insurance proceeds payable did not arise until the death of the insured, and therefore were not to be seen as having entered the insured's estate unless payable thereto). The decedent left, among other things, two "annuity contracts" in connection with which the decedent was the annuitant, and a daughter was the beneficiary. **Among the provisions of the policies was a surrender right, running in favor of the annuitant, which allowed the annuitant to surrender the annuities in return for the payment of the "cash surrender value," after the policies had been in force for at least two years** (as long as the surrender was effected on or within 30 days after any payment due date). The policies contained a calculation method for determining the surrender value. 9 So.2d at 531. The court notes that there are no Louisiana state court cases on the question of whether an annuity is to be excluded from the estate as insurance, but after consulting other jurisdictions, concludes that there is a distinction between

the two and that the annuity is subject to the laws of forced heirship. Perhaps foreshadowing the flight from Louisiana law we witnessed in *Young,* the court cites C.J.S. Annuities sec. 1, p. 1375, as authority for the proposition that "an annuity is generally understood as an agreement to pay a specified sum to the annuitant annually during life ..." and is to be distinguished from the insurance policy as "the consideration for an annuity contract is not generally regarded as a premium and is usually covered by a single payment." *Id.*

The beneficiary of the annuities raised the argument that the contracts at issue did not fit the definition of annuity contained in Civil Code article 2793. Though not specifically stated, the argument must have asserted that the surrender right (referred to above) gave the annuitant rights in addition to those set forth in article 2793, causing the contracts to be neither for life nor perpetual, and gave the contracts (providing for the "surrender" in return for payment of cash surrender value), one of the primary trappings of whole life insurance policies. Notwithstanding the statutory language, the court concludes: "There is nothing in these articles forbidding the making of a contract of annuity on terms different from those mentioned in the articles. *In the Succession of Cotton,* 172 La. 819, 135 So. 368, 370, it was said that the definition of an annuity, in article 2793 of the Civil Code, was 'by no means all inclusive.' " 9 So.2d at 531.[59]

At this point in our discussion we can offer a distillation of the Louisiana statutes and cases. First, the statutes imply the requirement of the transfer of a fund in return for the payment of "rent" but offer no indication of a limitation upon the mechanics of the transfer arrangement. That is, there is no statutory requirement that such a transfer cannot be a constructive one (i.e., client to underwriter—for attorney—and from underwriter to annuity company, with attorney retaining the right to receipt of rent). In

for cash value) that the policy be in effect for two years.

**59.** In another case dealing with the definition of annuity, *In re Talbert,* 15 B.R. 536 (Bankr. W.D.La.1981), the court held that an IRA was not an annuity under La. R.S. 20:33, adopting

the definition of annuity cited in *Succession of Rabouin*—an annuity is an "agreement to pay a specified sum to the annuitant annually during his life." (Of course, the "annuities" dealt with in *Rabouin* contained the right to surrender for the cash value after two years).

fact, the state Supreme Court has concluded, in the *Succession of Cotton*, that legatees who receive income beneficiary status *vis a vis* a testamentary trust have received annuities, and in the *Succession of Rabouin*, those contracts labeled "annuity policies," but which contained refund provisions (surrender for payment of "cash surrender value") limited only by the requirement that the policies be in effect for two (2) years, constituted annuities. The case law interpreting the annuities statutes have clearly found the actual language which would appear to provide restrictions upon contractual terms to be, at most, illustrative in nature, and have found arrangements which were apparently never contemplated by the statutes to be annuities. The State Supreme Court, in *Succession of Vidalat*, has distinguished an alleged liability grounded in a writing purporting, simply, to bind an obligor to the payment of a monthly sum from an annuity, on the basis that an annuity requires, initially, the transfer of a fund, from or upon which, rent can be paid.

█ It is clear, therefore, that the Louisiana law of annuities is rather expansive, certainly conferring annuity status upon agreements which do not comport with the statutory limitations. In fact, if there is a prevailing thread (*see Cotton* and *Rabouin*), it is that the Code requirements are illustrative that some sort of transfer of a fund need be made (*see Vidalat*), but that retention of control over the fund (which seems contrary to a fund having been transferred) can be controlled by the agreement, as opposed to the Civil Code articles.

3. The Fifth Circuit Speaks Again in *In re Guidry;* the Exemption Statutes are Analyzed in *Matter of Allison*

There are few, but among them are two Appellate Court decisions which together hold that *Young* misstates the law of Louisiana. Before we discuss these cases, we will discuss the most recent Fifth Circuit decision concerning annuities, *In Re Guidry*, 110 F.3d 1147 (5th Cir.1997).

In *Guidry*, the Court was faced with a non-bankruptcy claim of exemption (to stave off seizure) regarding a "variable annuity account" sought to be seized during its accumulation phase. Within the contract at issue, the "accumulation phase" was distinguished from the "annuity period." During the accumulation period, the purchaser/investor would deposit funds into the account which, through various such accounts, could be inserted at the direction of the purchaser (investor), with earnings having deferred taxation.

During the accumulation phase, the funds on deposit could be withdrawn, and the investment of the funds redirected by the investor. The seller, during the accumulation phase, provided account information services, effectuated trades, etc. At a moment in time designated in the policy, the policy was converted to its annuity phase, after which moment, and during which time, the seller of the policy owed annuity payments upon the fund, which were taxed as drawn. Prior to the annuity phase, there was no obligation to pay annuity or any other kind of payments, though there existed the obligation to honor withdrawal requests up until the annuity phase. It was only after the inception of the "annuity period" that the purchaser lost the rights of withdrawal, etc. having given the fund over to the company in return for the right to receive predetermined annuity payments.

█ The Court, citing to Civil Code article 2793, opines that "a fundamental characteristic of an annuity is the complete divestiture by the annuitant of all ownership interest in the principal fund." 110 F.3d at 1150. Citing a Louisiana appellate court case, the Court goes on further to limit the annuitant's interest to "the payments themselves and not in any principal fund or source from which they may be derived;" stating "an annuitant surrenders all right and title in and to the money he pays for it." *Id.* purportedly citing *WellTech, Inc. v. Abadie*, 666 So.2d 1237 (La.App.5th Cir. 1996).[60] The Court concludes that the "var-

---

**60.** While perhaps not relevant, the Fifth Circuit in *Guidry* was not really citing to a Louisiana State Court's opinion. The state court, where

referred to by *Guidry*, was in actuality referring to the argument of a creditor who had cited *Young* in its attempt to seize a lawyer's rights in,

iable annuity" is not exempt, during the accumulation period, given the level of control maintained. Along the way, the Court attempts to work its way through the Louisiana statutes in response to the argument that retention of control should not exclude the contract at issue from annuity (and thus exempt) status, given the redemption rights referred to in the statutes previously mentioned herein. (*See* La. Civ.Code Arts. 2796, 2797, 2798, discussed *supra*). The Court limits the extent an annuity can provide for redemption to those set forth in the statutes—the failure to pay rent and the dual redemption provisions of article 2797, and, though the Court does not attempt to explicate the concept of the "constituted annuity," it pretty well correctly analyzes the situations of the parties within the context of redemption rights, per the statute.[61] The ultimate conclusion of the Court is that, notwithstanding the redemption rights referred to, and

. ... even though article 2797 does not explicitly prohibit an annuitant from redeeming an annuity or from compelling redemption in circumstances other than those provided for in article 2793, we are not persuaded that, without further indication to the contrary, the redemption provision in article 2796 was intended to alter the basic principal that an annuitant, according to Louisiana's statutory definition, must relinquish at least some dominion and control over the account principle.

110 F.3d at 1152. Of course, one might ask whether "further indication to the contrary"

might include a state Supreme Court case (*see Succession of Rabouin, supra*) wherein the court determined that contracts providing a redemption right (designated as a surrender right) whereby the policy could be surrendered after two (2) years from its effective date in return for payment (by the seller) of a cash surrender value, was an annuity. *See also Succession of Cotton, supra* (Definition of "annuity" in the statute is not "all-inclusive.").

Maybe, in fact, the *Guidry* court did know about these cases because, notwithstanding the degree to which the court purports to adhere to the statutory definition, to limit redemption rights to the statutory limitations, note its actual, final conclusion: the annuitant "must relinquish at least some dominion and control over the account principle." 110 F.3d at 1152. This court can abide by this conclusion, for the Civil Code definition of annuity does have as its distinguishing characteristic the transfer of the fund to the other party in return for the obligation to pay rent.

Also, a better approach to explaining the extent to which control or dominion over the fund is relinquished, which could have been used by the court, is to analyze the distinction between the annuity and the contract of rent under Civil Code articles 2779–2792. Under the contract of rent, an immovable (piece of real property) was sold, with the seller reserving the right to receive rent in payments or from fruits of the property sold. The property was sold in full ownership, except that "the purchaser under reservation

---

to, and upon annuity policies. Referring to this argument, the state court had acknowledged the "analysis of *Young*" (upon which the creditor had relied), pointing to the part of the opinion cited by the creditor wherein the *Young* court was citing to the Pennsylvania state court. In fact, as will be seen, the *Abadie* Court very politely departs from *Young* and concludes that the lawyer's rights to annuity payments emanating (the same way Mr. Young's did) from a series of personal injury settlements were exempt. This court is somewhat chagrined at being told by a Federal Court, whose charge is to " 'attempt to predict state law, not to create or modify it ...' " *Guidry*, 110 F.3d at 1149 (citations deleted), that it is citing a Louisiana state Court's interpretation of Louisiana's state law, **when in fact it is citing a state court referring to the federal Fifth Circuit's citation of and to a Pennsylvania state** Court interpreting Pennsylvania law, which was used by the Fifth Circuit in *Young*, as authority for its own creation of Louisiana's state law without any reference whatsoever to Louisiana's state law on the issue faced. Use of this type of circular analysis provides unlimited opportunity for a Federal Court to create or modify state law and seems particularly distasteful when the state court opinion referred to holds differently from *Young*.

61. The right to redeem is broken into two components, the right to demand redemption (which is held by the annuitant, or one to whom the rent is payable, also referred to as creditor) and the right to redeem (held by the party to whom the fund was transferred and who owes the rent, also referred to as the debtor, or seller).

of rent is bound to preserve the thing in good condition that it may continue capable of producing wherewith to pay the rent." La. Civ.Code art. 2784. Also, the seller retained a mortgage on the property for the payment of rent, and as well, the rent obligation ran with the land and became the obligation of any successor owner under the terms of the contract. La. Civ.Code arts. 2787, 2791.

Under the annuity contract, while the annuitant retains a right to compel redemption under certain terms, and can reclaim the fund if the "receiver" fails to pay the rent agreed upon, in the event of insolvency of the debtor (the party owing the rent), the capital (or principle) is exigible (can be demanded or exacted). However, and the language is almost impenetrable, demand can be made against the fund, "only up to the amount at which it is rated, according to the order of contribution amongst the creditors." Art. 2798. In light of the particular requirement that the purchaser of immovable property subject to a reservation of rent preserve the property to pay the rent and own the property subject to a mortgage right securing payment of the rent, this annuity language must mean that the annuitant may claim only a share of the fund (a prorated share) according to the ratio of her claim to the total amount of claims of creditors. Read this way, the loss of dominion and control means that ownership of the fund has passed, and though the annuitant or payee has redemption rights and an underlying claim to the fund in the event of default in performance or insolvency, this claim is only that, a claim, and not a residual ownership interest that primes that of other creditors or, in fact, the debtor (seller).

In *Guidry*, it appears as though the funds invested were held in the investor/purchaser's account, from which they could be **withdrawn** at will. (It appears, therefore, that there was no transfer of ownership in the fund, so that the withdrawal rights, rather than a simple, unsecured claim against the company, remained a claim to the investor/depositor's funds.) According to our reading of the agreement, the company, until the annuity period, **held the investor's money,** which stayed the investor's money.

Thus, the issue is whether, until the annuity period, **there is any transfer whatsoever.** If not, then the policy would not constitute an annuity even under *Rabouin,* as the surrender right in *Rabouin* was merely the right to surrender the policy for a claim equal to the cash surrender value **of the policy itself.** Payment of the surrender value would have been made with the company's funds. That is the difference. *Rabouin* may stand for the proposition that the *Guidry* court was obligated to discuss whether redemption rights less limited than those afforded under the statute are permissible (*Guidry* suggests "no," but in reality leaves much wiggling room). However, *Rabouin* does not disturb the basic notion that there must be a transfer of funds (the fund) to the party owing the annuity payments. In *Guidry* there was no such transfer as of the time of the seizure.

There is one other thing that could have been mentioned by the court in *Guidry* (because it would have been dispositive, in a paragraph). The reason that the "variable annuity" in *Guidry* was not an annuity contract during the accumulation period was that there was no obligation to pay rent to the annuitant. The contract was nothing more than an investment vehicle which afforded the annuitant investment choices for his money, up until the time the policy matured into an annuity. The name of the contract, the "Variable Annuity Account," is indicative of the tax-free savings account nature of the contract, at least during the accumulation phase. Without the obligation to pay rent, that whole side of the annuity equation was missing, so the arrangement could not have been an annuity, even under the relaxed Louisiana Supreme Court view of statutory construction in this area. Rather than focus on the level of control, then, the Fifth Circuit could have ended its inquiry with the conclusion that, without the rent obligation, the contract simply did not qualify as an annuity during the accumulation period.

In *Matter of Allison v. Federal Deposit Insurance,* 817 F.Supp. 630 (M.D.La.1993), the Court dealt with an attempted seizure of annuity policies by a creditor who had obtained a judgment in excess of ten million

dollars on May 31, 1991, and who was doubt-less "concerned" that the debtors, between April 7, 1991, and June 24, 1991, had purchased some five million dollars worth of annuities and life insurance policies (and were, as of the attempted seizure, claiming them as exempt). The debtor intervened and claimed that the seizure was unlawful on the basis of the exemption of the annuities (and life insurance policies) afforded by La. R.S. 20:33(1) and 22:647(A)-(D).

The Court, undertaking to interpret Louisiana law, rejected the creditor's argument that the provisions of the statutes (which limit exemptions of life insurance policies and certain other retirement accounts, IRA's, etc., by excluding from the exemption contributions made during the year before seizure, and the cash value over the first $35,000) were applicable to annuity contracts. The Court held that the long-standing policy of exempting annuities evidenced by statutes overcame the argued possibility that the rather modern limitation (made a part of the statute in 1983) applied to annuities. Therefore, held the Court, the annuities purchased, though clearly purchased immediately around the issuance of the judgment to shield assets from seizure, were exempt under Louisiana law. This case actually ferrets out legislative intent, analyzes the language and history of statutes, and comes to a well reasoned opinion as to the law of Louisiana (which eschews any temptation that might have been felt to superimpose its own feelings as to what the law should have said). Of primary interest is the court's conclusion that there is no limitation upon the exemption of annuities contained within the annuity statutes, and its reading of the unbroken decades of legislative intent to afford an exemption for annuities that is wide of scope.

4. *Matter Of Young* Meets Its Demise In A Louisiana State Court.

■ One Louisiana state court has had the occasion to rule on the precise question

by *Young*, twice in fact, and has politely renounced it each time. In *WellTech, Inc. v. Abadie*, 666 So.2d 1237 (La.App.5th Cir. 1996), the Court was faced with an attempted seizure (by garnishment) of payments from annuity policies due an attorney. The annuity policies had been purchased by Intermediaries who had assumed the obligations due the attorney from several clients and/or defendants sued by the clients. The trial Court had enjoined the creditor, holding the payments to be exempt. On appeal, the creditor argued *Young* as dispositive, asserting that the payments from the annuities were "merely payments for services, and not qualified retirement planning strategies and, therefore, should not be exempt from seizure." 666 So.2d at 1240. The Court refers to *Young* and its rationale, even quoting extensively from the opinion in explication of the creditor's argument. In summation, the Court cites *Young* as concluding that "the arrangement was in the nature of an 'account receivable,' because Young retained an interest in the principal until the debt was extinguished in fourteen years." *Id.* at 1240. The Court attempts to distinguish its factual findings from the Federal Fifth Circuit as follows:

> ... the amounts of attorneys fees owed to Abadie by his clients were used to purchase three annuities and a partial assignment of a fourth annuity. Abadie has no interest in the principal amounts, which were used for the purpose of purchasing the annuities. Abadie has only the right to collect the monthly payments from these annuities. Most importantly, the annuities do not have a set maturity; they are payable for life and not for a set term as in the *Young* case.[62] Finally, Abadie has released his clients from any further obligation for payment of attorney fees.

*Id.* at 1240–1241.

Responding to the creditor's argument that "these payments are in the nature of

---

**62.** Though this factor was cited by the Court as the most important one, in fact, one of the payment streams, the one whereby the **client** assigned a share of the **client's annuity** to Abadie **was for a term less than life.** See *WellTech, Inc. v. Abadie*, 683 So.2d 809, 811 (La.App.5th Cir. 1996). Also, as to whether the annuity must be

at least for life, at least with respect to redemption or surrender rights, see *Succession of Rabouin, supra.* See also Article 2796, *supra.*

Yiannopoulos, 2 La. Civil Law Treatise 3rd § 150 (1991): "Rents of land are perpetual but redeemable, whereas annuities may be stipulated for a designated term, for life, or in perpetuity."

accounts receivable, and to classify same as annuities creates a great loophole in the garnishment laws ...," the Court flatly states: "However, if this is so, it is the legislature that created the loophole and it is up to the legislature, not the courts, to close it if such is their will." *Id.* at 1241. Further, and focusing on the actual language of the exemption statutes (which, by the way, make no mention of accounts receivable), the Court notes that the exemption statute:

> ... provides that ALL proceeds and payments under annuity plans shall be exempted from ALL liability, EXCEPT alimony and child support. Logic and rules of English grammar tell us that the word all is inclusive of every thing, other than that which is specifically excepted.[and that] If the legislature had intended for certain kinds of annuities to be exempt from seizure in instances other than to pay alimony and child support, then certainly it would have named them.... Obviously, the legislature did not do this, so we can conclude that the use of the word all means exactly that—that all annuities are exempt from seizure.

*Id.* at 1241. (Emphasis in original). The Louisiana Court, then, goes much beyond its distinguishment of *Young,* concluding that *Young,* in embracing a distinction (between annuities and annuities that are also accounts receivable) that does not exist in Louisiana exemption law, espouses an analysis that must be rejected.[63]

The unsuccessful creditor petitioned the Louisiana Supreme Court for relief, which was in part granted. At 672 So.2d 698 (La. 1996), the Supreme Court directed: "The decision of the court of appeals is vacated, and the case is remanded to the court of appeals to consider whether the obligations of the Intermediaries to Abadie are exempt from seizure by La. R.S. 13:3881(D)." On remand the Court understands its charge as requiring comment as to whether the actual obligations of the "Intermediaries" to Abadie,

as opposed to the payments under the annuities, were exempt as annuities. *WellTech, Inc. v. Abadie,* 683 So.2d 809 (La.App.5th Cir.1996). Apparently, at some point the creditor had filed separate garnishment petitions seeking to garnish the obligations of the purchasers of the annuities (the "Intermediaries"), who had assumed the obligations to make periodic payments to Abadie as part of the settlements by which the fees were generated. 683 So.2d at 810. Brief and specific mention of the relationship of the "Intermediaries" within the overall arrangement is warranted.

According to the Court, Abadie, the plaintiffs' lawyer in some four (4) lawsuits, effectuated settlements on behalf of his clients. As part of the settlements, the Intermediaries were to assume the obligations of the defendants to the plaintiffs and/or the plaintiffs' attorney, Abadie. With respect to the attorney's fees obligations, the Intermediaries were obligated to make specified monthly payments for the remainder of Abadie's life (in one settlement, a direct partial assignment of the Intermediary's obligation to the client was made to Abadie, resulting in an obligation to make periodic payments for a term, as opposed to for life). According to the Court,

> Each contract further provides that each Intermediary is not required to set aside funds for Abadie, or to otherwise secure their obligation to him, and that Abadie has no right to accelerate, decelerate, increase or decrease the amount of any payment to be made under the agreement. Each Intermediary can meet its obligation by the purchase of an annuity, and that the obligee (Abadie) has no ownership of the annuity and no control over the annuity in any manner. The annuity contracts reflect that the Intermediary purchased an annuity, with a single premium, (undisclosed) and that said annuity was payable for life only. It is true that each Intermediary had assumed the obligation to pay attorney

**63.** The concurring opinion shares *Young*'s distaste for exempting the annuity payments, in no uncertain terms. However, rather than act on such, memorializing as law mere distaste for outcome, the concurring opinion bemoans and yet affirms the Court's job—interpreting law as

written. "Such a scheme or plan needs to be addressed by the legislature, otherwise **anyone who is owed a substantial sum of money or obtains an award or judgment can have the proceeds placed out of reach of his creditors.**" *Id.* at 1241 (emphasis supplied).

fees to Abadie. It is equally true that, in order to meet these obligations, each Intermediary purchased an annuity which will pay to Abadie the amount owed, that being the set amount monthly for the remainder of Abadie's life (with exception of the Trufant Settlement, in which the Intermediary purchased one annuity to satisfy the obligation owed to the plaintiff, who assigned 40% of those annuity proceeds to Abadie). . . . .

*Id.* at 811. In summation, the *Abadie* court holds, and reiterates,

... that the obligations of the Intermediaries, which are discharged by the annuity payments, should be and are properly included in the preliminary injunction which prohibits the seizure of the annuity payments. To hold otherwise would result in the seizure of the payments themselves, which, as observed above, is clearly prohibited by the Louisiana legislature. . . .

*Id.* at 812. The *Abadie* court, therefore, at least with respect to the annuity that is effectively for a term, is faced with exactly the fact situation of *Young* (though we have seen that the attempt by the State Court to distinguish *Young* based on the difference between an annuity for life and one for a term was long ago made unnecessary by the state Supreme Court).[64] The lawyer retains the original claim against the purchaser of the annuity, known as the "Underwriter" in *Young* and the "Intermediary" in *Abadie*, until all payments required by the terms of the annuity (which mimic the terms of the underlying settlement) are made. There is at least one actual annuity policy in each case, purchased with a lump sum single payment. In neither case does the lawyer own the policy nor have an interest other than as annuitant or payee. In neither case does the purchaser of the annuity make any special arrangements on behalf of the annuitant or payee to further secure the obligation represented by the annuity policy. In neither case does the annuitant or payee have any right of redemption, to surrender for cash value, or any interest whatsoever in the money used to purchase the annuity. There is no indication that either lawyer retained claims against the clients for fee obligations assumed by the Underwriter or the Intermediaries.

Notwithstanding the "similarities," the differences between the perspectives of the Courts is immense. To the Federal Fifth Circuit, the right to assert a claim against the Underwriter [65] is synonymous with retaining a right to the principal fund. To the State Fifth Circuit, this right is (properly we think) lagniappe, a not-to-be-utilized claim, which clearly does not give Abadie any rights in, to, or upon the **fund used to purchase the annuity, which, upon issuance of the annuity, is replaced by the annuity.**[66] As

64. There is one immaterial difference between the two fact patterns. In *Young*, the lump sum purchase price payment for the annuity was known, in *Abadie* the payments were undisclosed.

65. Remember, there is absolutely no reason to believe that Young retained a claim against his former clients; the Court in *Young* only says that he retained a claim on account' of his claim against the former clients, which of course he did as a result of the assumption of this claim by the Underwriter. The *Abadie* Court attempts to distinguish *Young* on the ground that Abadie retained no claim against the clients themselves, an attempted distinction thought necessary, perhaps, because of the following language in the *Young* opinion, "It appears, then, that the monthly payments made to Young represent nothing more than installment payments on debts to cover the fees owed to Young by the Fanguys." 806 F.2d at 1307. However, close reading of the opinion makes clear that some $155,196 was paid to the Underwriter, which was "part of the payment debtor received for services rendered on behalf of the Fanguy family ..." *Id.* As such, and upon the continual references to the retention of a claim against **the Underwriter,** it is clear that the Court was referring to the **debts of the Underwriter, incurred as part of the overall settlement, to cover the debts formerly owed by the clients to the lawyer.** In sum (again), there was no claim retained by Young against his former clients, upon which to base a distinction between the *Young* and *Abadie* situations.

66. On the question of whether retention of the claim equates to retention of ownership, dominion, or control of the fund used to purchase the annuity, or, in fact, whether retention of the claim has any effect at all, the *Abadie* court says "At this time, each Intermediary has discharged its obligation to pay monthly through the annuity payment—it would be only as a result of some future occurrence that the Intermediaries might again become responsible for payments to Abadie." 683 So.2d at 811.

pointed out by the *Abadie* Court, the lawyer retains no ownership, dominion, or control over the fund that made up the payment for the annuity, and with the possible exception of certain tax consequences arising from forestalling the receipt of the entire fee due,[67] is in a situation no different, with respect to the annuity contract, than if he had bought the annuity himself.

### D. Should The Fifth Circuit Abandon *Young?* Can It?

#### 1. The Setting

As the charge of this court is to interpret Louisiana law, so was the charge of the Fifth Circuit in *Young.* Canfield suggests that *Young* is the dispositive, binding precedent in the circuit, and that *Young* compels the decision that the payments due the Debtor, or the annuities under which he is the payee, are not exempt. Where are we now?

A Louisiana appellate court has held (twice) that *Young* is not correct. The State Supreme Court has not reviewed the second *Abadie* opinion, which reaffirms the first one and expands the "all annuities are exempt" conclusion to cover the pre-existing obligations which generated the purchase of the annuities (and which would not be finally satisfied until all payments under the annuities are made). Notwithstanding fervent, direct pleas within the *Abadie* opinions to the Louisiana legislature (and the holding of the *Allison* case-referred to above—that notwithstanding the obvious diversion of assets into annuities immediately before and after issuance of judgment, the intention of the Louisiana legislature has historically been to

exempt all annuities), that the holdings demonstrated inadvertent loopholes existing in the statute, there has been no legislative response. Even given all of this, is the Fifth Circuit bound by *Young?*

#### 2. The *Erie* Charge

A federal court sitting in diversity (or, as was the case in *Young*, interpreting state law upon another basis), is bound to follow state substantive law on the issue presented. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Absent a pronouncement by the state's highest court, the federal court must look elsewhere, mindful that "a federal court is not free to reject the state rule merely because it has not received the sanction of the highest court, even though it thinks the rule is unsound in principle or that another is preferable." *West v. American Telephone and Telegraph Co.,* 311 U.S. 223, 236, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940). "Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other data that the highest court of the state would decide otherwise." *West,* 311 U.S. at 237, 61 S.Ct. at 183. *See Transcontinental Gas Pipe Line Corporation v. Transportation Insurance Co.,* 953 F.2d 985, 988 (5th Cir.1992) ("... although we are not bound by state appellate court decisions, we will not disregard them 'unless [we are] convinced by other persuasive data that the highest court of the state would decide otherwise.'" (Citations omitted)); [68] *Lavespere v. Niagara Ma-*

---

**67.** This court wonders why the Federal Fifth Circuit had such a problem with Young not paying taxes upon the entirety of the fee due as it came due. Recall, there was a tradeoff made by Mr. Young. For not paying the taxes, **he did not get the money! Not only that, but as long as the annuity payments were made, he could not get the money!** In fact, we know the money—the initial payment for the annuity—was, initially, paid. However, not to Young, who would receive his fee over a period of fourteen (14) years, with each payment to him being taxable.

**68.** As was mentioned in *Transcontinental Gas Pipe Line Corporation,* at 953 F.2d 988, concerning the precedential value of case law in Louisiana, "The concept of stare decisis is foreign to the Civil Law, including Louisiana. Therefore,

in cases such as this [where there is no State Supreme Court or U.S. Supreme Court decision on the question presented] we are guided by decisions rendered by the Louisiana appellate courts, particularly when numerous decisions are in accord on a given issue—the so-called jurisprudence constant—but we are not strictly bound by them." Another case focusing on the Civilian aversion to case law precedent is *Shelp v. National Surety Corporation,* 333 F.2d 431 (5th Cir.1964). In this case the court was faced with an intermediate appellate court decision which was contrary to the principle announced in many other Louisiana cases, including some emanating from the Supreme Court. The court, undertaking its charge from *West,* concludes that there is extensive data upon which to conclude that the

*chine and Tool Works, Inc.*, 920 F.2d 259, 260 (5th Cir.1990) ("Under the *Erie* doctrine that state law is applicable in a federal diversity jurisdiction case, state intermediate appellate court decisions constitute indicia of state law even when decided after a federal court has rendered a contrary opinion if the federal judgment has not yet become final.[ft.nt.8].[69] Such decisions, if applicable, should, therefore, be followed absent a strong showing that the state supreme court would rule differently"(citations omitted)); *Ladue v. Chevron, U.S.A., Inc.*, 920 F.2d 272, 274 (5th Cir.1991) ("We are therefore bound by an intermediate state appellate court decision only when we remain unconvinced 'by other data that the highest court of the state would decide otherwise.'" (Citations omitted)); [70] *Exxon Company, U.S.A. v. Banque De Paris Et Des Pays–Bas*, 889 F.2d 674, 675 (5th Cir.1989), *cert. denied*, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990) ("A federal court sitting in diversity is bound to follow decisions of the state's intermediate appellate courts 'unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.' There is, therefore, a working presumption that state intermediate court decisions represent accurate statements of state law" (citations omitted)); [71] *Green v. Walker*, 910 F.2d 291, 294 (5th Cir.1990) ("The decision of an intermediate appellate state court guides, but does not necessarily control, a federal court's determination of the applicable state law");

state Supreme Court would hold differently from the appellate court decision which had decided the precise legal issue presented. One such item was that the highest court had granted review of the supposedly dispositive intermediate court decision, only to have the case dismissed by agreement of the parties. Also, as the court points out at Ft. nt. 30, "The Court of Appeal admitted that if it followed the decisions of the Supreme Court 'it would be compelled to insert and add the word doors to the last paragraph of article 2716 ...'" The Fifth Circuit, rather than rely purely on the maneuvering room allowed a federal court by *West*, suggests that the federal court is not bound by the court decisions of a Louisiana intermediate court if it disagrees with its interpretation of the law—which is the "solemn expression of legislative will" in Louisiana. *See*, La. Civ.Code art. 1 (1995). Curiously, the appellate court had utilized its own version of abhorrence of stare decisis, preferring to interpret the statute at issue as unambiguous, and therefore as not admitting of resort to Supreme Court "principles" of interpretation.

**69.** The *Lavespere* court, in footnote 8, cites to *Exxon Co., U.S.A. v. Banque de Paris et des Pays–Bas*, 488 U.S. 920, 109 S.Ct. 299, 102 L.Ed.2d 319 (1988) (mem.). As shown below (see ft. note 71), the *Exxon* case was remanded to the Fifth Circuit by this cited Supreme Court opinion on the basis of a Texas state court case decided after the Fifth Circuit's opinion. This sentence in *Lavespere* is subject to misconstruction, if taken to be a limitation upon circumstances under which the Fifth Circuit is to look to subsequently decided intermediate state appellate court decisions regarding state law. Clearly, if understood in context, the *Lavespere* Court is referring to the obligation to look to subsequently decided state court cases which clearly conflict *even with the case already decided, if the decision is not final* (for example, if a party brings the subsequently decided state court case to the Court's attention

by means of request for rehearing, or rehearing en banc or the matter is remanded, a la *Exxon*, by the Supreme Court). The Court is not suggesting that it is only in situations where the 5th Circuit decision is not final that subsequently decided state court decisions are to be followed. See discussion above.

**70.** To this court the phrasing, though superficially adhering to the *West* directive, seems to imply that the party seeking to rely upon the intermediate appellate court decision bears the burden of rebutting something like a reverse presumption, that the highest court would reverse, and could be read as also requiring that party to bear the burden of persuasion on the question "why would the high court not reverse?" This seems out of sync. See next footnote, referring to an opinion written by the author of *Ladue*, wherein the court adopted a "working presumption that state intermediate court decisions represent accurate statements of state law." This is a far throw from the *Ladue* proposition—not bound unless convinced that this court wouldn't act differently.

**71.** This case had a winding history, which, when looked at, sheds light upon the obligation of a federal court sitting in diversity to consider the decisions of intermediary state courts. The original opinion in *Exxon*, which is found at 828 F.2d 1121 (5th Cir.1987), was vacated, and remanded by the U.S. Supreme Court, at 488 U.S. 920, 109 S.Ct. 299, 102 L.Ed.2d 319 (1988) (Mem). The order of remand order requires "further consideration in light of *Kerr Construction Co. v. Plains National Bank*, 753 S.W.2d 181 (Tex.App.–Amarillo 1987, writ denied)." On remand, the court certified the state law question presented to the Texas Supreme Court. See 867 F.2d 1524 (5th Cir.1989), which declined to answer it. The final opinion emanates from this espoused presumption, and follows the intermediate court opinion.

*Taylor v. Jim Walter Corp.,* 731 F.2d 266, 267 (5th Cir.1984) ("We are bound by the decisions of the intermediate appellate court ... absent a 'strong showing' that the Louisiana Supreme Court would hold to the contrary. In view of these direct precedents, we must decline the plaintiffs' invitation to follow dicta in *Day v. National U.S. Radiator Corp.,* 241 La. 288, 128 So.2d 660, 666 (1961)" (citations omitted)); *Birmingham Fire Insurance Company of Pennsylvania v. Winegardner and Hammons, Inc.,* 714 F.2d 548, 550 (5th Cir.1983) ("That the court which decided Miller is not the highest court of Texas does not free this court to disregard its holding. On the contrary: We consider ourselves *Erie*-bound to apply the law as it has been interpreted by the highest state court to rule on the matter ...when the supreme court of a state has not spoken to a particular issue, the well established practice of this court is to follow the opinion of the highest court which has written on the matter"); *Scarborough v. Northern Assurance Company of America,* 718 F.2d 130, 136 (5th Cir.1983) ("Although Cooling and Templet are decisions of intermediate appellate courts, they are controlling, absent strong indication that the Supreme Court of Louisiana would have decided them differently"); *Mott v. Mitsubishi International Corp.,* 636 F.2d 1073, 1074 (5th Cir.1981) ( "A decision of the Court of Civil Appeals is controlling on questions of state law in this court, absent strong indication that the Texas Supreme Court would decide the issue differently"); *see also, Bailey v. Southern Pacific Transportation Co.,* 613 F.2d 1385 (5th Cir.1980); *Allen v. A.G. Edwards & Sons, Inc.,* 606 F.2d 84 (5th Cir.1979); *Continental Grain Co. v. Martin,* 536 F.2d 592 (5th Cir.1976), cert. denied, 429 U.S. 1024, 97 S.Ct. 643, 50 L.Ed.2d 625 (1976); *Thorington v. Cash,* 494 F.2d 582 (5th Cir.1974).

**3. Panel Opinion As Precedent**

 The general rule regarding the precedential value of a panel decision of the Fifth Circuit is that it must be followed by all subsequent panels unless and until it is reversed by the Court *en banc,* or until a superceding opinion of the U.S. Supreme Court. *Narvaiz v. Johnson,* 134 F.3d 688

(5th Cir.1998); *Batts v. Tow–Motor Forklift Co.,* 978 F.2d 1386, 1393 n. 15 (5th Cir.1992) "[i]n this circuit, one panel may not overrule the decision, right or wrong, of a prior panel in the absence of en banc reconsideration or superseding decision of the Supreme Court" quoting *Burlington N.R.R. Co. v. Brotherhood of Maintenance of Way Employees,* 961 F.2d 86, 89 (5th Cir.1992), *cert. denied,* 506 U.S. 1071, 113 S.Ct. 1028, 122 L.Ed.2d 173 (1993) (citations and internal quotations omitted); *Albany Insurance Co. v. Kieu,* 927 F.2d 882 (5th Cir.1991); *U.S. v. Eckford,* 910 F.2d 216 (5th Cir.1990); *Hodge v. Seiler,* 558 F.2d 284 (5th Cir.1977); *Puckett v. Commissioner of Internal Revenue,* 522 F.2d 1385 (5th Cir.1975); *U.S. v. Lewis,* 475 F.2d 571 (5th Cir.1972).

**4. Panel Opinion As Precedent When Subsequent Intermediate State Appellate Court Opinions Establish That Prior Panel Opinion Incorrectly Interprets State Law**

When sitting in diversity cases, the Fifth Circuit has held "that ...we must follow subsequent state court decisions that are clearly contrary to one of our prior decisions." *Floors Unlimited v. Fieldcrest Cannon, Inc.,* 55 F.3d 181, 185 (5th Cir.1995) (where two Texas court of appeal decisions issued subsequent to diversity decisions were clearly contrary to prior Fifth Circuit decisions, the prior decision(s) were "not a correct statement of Texas law and thus ... no longer binding precedent in this Circuit" 55 F.3d at 185); *Pruitt v. Levi Strauss & Co.,* 932 F.2d 458 (5th Cir.1991); *Farnham v. Bristow Helicopters, Inc.,* 776 F.2d 535 (5th Cir.1985) (two Louisiana appeal court decisions, decided after the Fifth Circuit interpreted the Louisiana long-arm statute, required a finding that the prior decision should not be followed—"In diversity cases, however, we are to follow subsequent state court decisions that are clearly contrary to a previous decision of this court." 776 F.2d at 537). *See also, Broussard v. Southern Pacific Transportation Co.,* 665 F.2d 1387 (5th Cir.1982).

The Fifth Circuit, then, when faced by intermediate appellate court decisions that are clearly contrary to a prior Fifth Circuit

decision interpreting state law, has followed the guide of the intermediate courts as the **law of the state** and has abided the notion that a panel can conclude and hold that the prior decision, otherwise binding precedent, is no longer reflective of state law and therefore is not binding law in the circuit. These holdings comport with the prevailing understanding by the Fifth Circuit of its *Erie* charge, as explained in *West*, that "Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other data that the highest court of the state would decide otherwise." *West*, 311 U.S. at 237, 61 S.Ct. at 183. If the intermediate appellate decision meets this standard set forth in *West*, it matters not whether the federal court has previously decided what it believes the state law to be or concludes that its understanding of state law is preferable to that of the prior state appellate court. In each situation, previously decided case and difference of opinion as to what the state law is, the Federal Court must yield.[72] Without facing the question of whether this (an inferior) court is bound by decision of a Circuit panel that has subsequently been shown to incorrectly state the law of the state (by a clearly contrary intermediate state appellate court decision), we conclude that a Fifth Circuit panel, if faced with the factual situation and legal issues presented by *Young*, could conclude that it is not bound by *Young*, without the necessity of *en banc* review, on the basis of the two *Abadie* opinions. Next question. Would it?

### 5. Well, Would It?

Answer, in a word, yes. Recall the requirement set forth by *West, supra*, and the Fifth Circuit cases cited above, that the intermediate court opinions are binding, without **convincing other data** that the highest court would hold otherwise. Subsequent intermediate state court opinions are equally binding, if clearly contrary.

This court is satisfied that the *Abadie* opinions are clearly contrary to *Young*, notwithstanding the feeble purported attempt, within the first opinion, to distinguish it. As we have seen, the very facts upon which *Young* was supposedly distinguishable were the same as in *Abadie* (in fact, if the *Abadie* court erred, it was in reading *Young* carelessly, probably out of an abundance of politeness in its urge to distinguish). Recall, as well, that the *Abadie* court implored the Louisiana legislature to fix the statutory loophole which compelled the exemption of **all annuities,** and suggested that the result reached would be seen by the legislature as an inadvertent consequence of the statutory lan-

---

**72.** Because of this court's ultimate conclusion, that the matter before it presents a factually and legally distinct case from that of *Young*, it need not wrestle with the question of whether the *Young* case is binding on this bankruptcy court. It should be clear by this juncture that we believe that if faced with the *Young* case again, the Fifth Circuit would be bound not to follow *Young*. However, we have spent time sufficient to provide us with the answer to whether it is possible that inferior courts in the circuit can deem the subsequently shown-to-be-wrong state law decision to be non-binding.

In *Kerr v. Smith Petroleum*, 909 F.Supp. 421 (E.D.La.1995), the court was faced with a motion for reconsideration based upon a state court decision subsequent to that of the up until then controlling 5th Circuit decision. According to the mover, the district court should have granted reconsideration, on the ground that the prior 5th Circuit case had been, effectively, overruled. Citing *Lavespere*, the district court concludes as follows: "The ruling in *Melancon v. Amoco Production Co.*, 834 F.2d 1238, 1248 (5th Cir.1988) [the prior 5th Circuit decision] has long since been final, and the Court finds that the facts of this case make it legally indistinguishable from *Melancon*. Hence, this Court is bound to follow *Melancon*, whether *Phillips Petroleum Company v. Liberty Services, Inc.*, 657 So.2d 405 (La.App. Cir.1995) [the state court decision decided subsequently] agrees with the Fifth Circuit or not. Moreover, [mover] has not shown—and the Court's independent review has not revealed—that the Fifth Circuit has reconsidered its decision in *Melancon* based upon *Phillips* or any other case, including but not limited to any ruling by the Louisiana Supreme Court." Id. at 426–427. According to the court, then, the "not final" language provides, at least to lower courts, a fundamental precondition to a lower court deciding that a prior Circuit decision is no longer binding. Of course, it may be that the *Kerr* court is saying nothing other than if a 5th Circuit opinion is not final (i.e. that mandate has not issued) it is not precedent; if it is, it is. It is sufficient to say that this court is satisfied to be satisfied that *Young* is distinguishable.

guage. Note that, notwithstanding these pleas (the concurrence in each opinion was written for the sole purpose of railing against the holding, as needing fixing, though being required by the law as written), the Louisiana legislature has not seen fit to amend the many exemption statutes by which annuities are exempted.[73]

Are there any other data by which the Fifth Circuit could be convinced that the Louisiana Supreme Court would hold otherwise than *Abadie?* Let us start with other decisions of the state courts. We have searched and searched, and have come up with only one Louisiana state court opinion touching on the issues raised by *Abadie* and *Young.* In *Cashio v. Tollin,* 686 So.2d 1066 (La.App.5th Cir.1996), *writ denied,* 691 So.2d 87 (La.1997), the same court which decided *Abadie* was faced with an attempted garnishment of what was alleged to be annuities, or the payments thereunder. The trial court had dismissed the garnishment pursuant to *Abadie.*[74] On appeal, the state 5th Circuit reversed, concluding that the dismissal of the garnishment had been tantamount to the issuance of a permanent injunction, without trial, but rather through a proceeding that mimicked a hearing on motion for summary judgment, with elements of a no-cause-of-action proceeding (which, in Louisiana procedure, cannot be combined).

The court was clear as to the basis, other than improper procedure, for its reversal and remand: "In the instant case there was no evidence as to the nature of the funds sought to be garnished." *Id.* at 1068. In other words, the parties objecting to the garnishment rested on the statements in pleadings that the instruments and funds payable thereunder were annuity policies or annuity payments, without producing evidence as to whether this was so. There is a statement within the opinion which could perhaps be grasped as datum in favor of adhering to *Young* as the way the Louisiana Supreme Court would rule, or, alternatively, that the *Abadie* decisions are not clearly contrary to *Young.* The court says, in support of its conclusion that the nature of the funds sought had not been subject to evidence. "In *Young, supra,* it was the substance of the arrangement and not the label which determined whether the payments were an annuity and subject to exemption. A mere label was insufficient to trigger the exempt status." *Id.* Why did this court say this?

Don't know. However, if anything is clear, it is that *Young* did not involve a mere label. The case involved an annuity **that was also an account receivable, just as *Abadie* did.** Let's look further. The opinion also has a couple of things to say about *Abadie* as it relates to *Young* and its holding. The creditor had cited *Young* for the proposition that an annuity, to qualify for exempt status must be purchased with tax exempt funds. To this the court replies, "However, in *Young* as in *WellTech* this issue was not reached. In both cases the issue was whether the funds were an annuity rather than accounts receivable." *Id.* Regarding the holding of *WellTech v. Abadie,* the court states—"In *WellTech* ... we held that periodic payments to an attorney constituted an annuity rather than an accounts [sic] receivable and as such were exempt." *Id.* at 1066–67.

What we see, therefore, is that the state court is satisfied that the contracts in *Abadie* were annuities, and therefore exempt, rather than merely accounts receivable. Further, it

**73.** In fact, the legislature, in 1997, **did amend** the exemption statute pursuant to which the exemption here primarily rests, La. R.S. 22:647. However, the annuity exemption provisions were not touched. We cite the West Electronic Pocketpart reference to the legislative history of the statute:

Acts 1997, No. 1416, S 2 inserted a new subsec. C, relating to Education Assistance Accounts; redesignated former subsecs. C, D, and E as subsecs. D, E, and F; substituted, in the introductory clause of subsec. D, "Subsections A, B, and C" for "Sub-section A and B"; inserted, in pars. D(1) and D(2), and in subsec.

E, "or Education Assistance Account depositor's agreement" following "contract", with attendant punctuation adjustment; inserted, in par. D(2), following "annuitant", "or to the estate of an Education Assistance Account owner", and substituted, in the same sentence, "this Subsection" for "this Sub-section."

The amendments effected no change whatsoever to subsection (B), which contains the general annuity exemption.

**74.** We have throughout this opinion referred to the *Welltech v. Abadie* as *Abadie.* The state court refers to it as *WellTech.*

is satisfied that *Young* dealt with the same legal issue. Finally, it believes that it is not enough to title an agreement an annuity to have it qualify for exempt status; the contract must also **be an annuity**. Unfortunately, it appears that the state court remains bent on being polite. Recall that the Fifth Circuit trumpeted its charge as determining when an annuity that is also an account receivable should, really, be called an account receivable rather than annuity, and determined that the right to go against the Underwriter jettisoned the annuity contract from exemption land. The exact same question yielded the opposite answer in *Abadie*. What *Cashio* in fact shows is how averse to the holding of *Abadie* the state court is (recall the concurrences). There will be no presumption that just because a contract says it is an annuity that it is, no presumption that because insurance companies are involved and have established payment obligations that they owe these pursuant to true annuity policies. From now on, the Fifth Circuit case *Guidry* (cited and discussed above) can stand for the proposition that the title of an instrument is not dispositive of its true nature; there need be no further mention of *Young*.

In sum, the state court correctly required proof of the nature of the contract. However, its mention of *Young* does not obviate the repudiation of *Young* which exists within the same opinion (but which exists full bore also by means of the *Abadie* holdings themselves). *Cashio* is not a datum suggesting a state Supreme Court disagreement with *Abadie*, and the politeness underlying the references to *Young* do not undermine the degree of actual disagreement shown for it.

Anything else other than what has been mentioned? Well, for one thing, it would not do for the Fifth Circuit to use the Young decision itself as a contrary datum. What, then, about the Louisiana modes of statutory construction that have been mentioned as having been referred to in a few Fifth Circuit cases as being of weight when making an *Erie* determination? Would this statutory interpretation analysis provide the Fifth Circuit with a mode by which it could free itself from the constraints of being bound by the holdings of *Abadie?*

▌ Article 1 of the Louisiana Civil Code, reminding the Court of the primacy of legislation, provides that the "sources of law are legislation and custom," [75] and Article 2 pronounces that "[l]egislation is a solemn expression of legislative will." [76] Therefore, the task before a court seeking to interpret a Louisiana statute is to determine the "legislative will" in promulgation of the statute (in this case La. R.S. 22:647 (1995)).

Article 9 of the Louisiana Civil Code instructs the Court as follows: "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature." [77] Moreover, with regard to the meaning of words, Article 11 of the Louisiana Civil Code provides: "The words of a law must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the law involves a technical matter." Acknowledging the possibility of linguistic frailty inherent in the legislative

**75.** La. Civ.Code art. 1 (1995).

**76.** La. Civ.Code art. 2 (1995).

**77.** This version of the Code provision emanates from an earlier and more pointedly colorful directive, found primarily in Article 13 of the Civil Code of 1870: "When a law is clear and free from all ambiguity, the letter of it is not to be disregarded, under the pretext of pursuing its spirit." Also, on the primacy of the "plain meaning rule" within the ambit of federal statutory construction, *see generally*, *U.S. v. American Trucking Associations*, 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345, 1350–51 (1940); *Sutton v. United States*, 819 F.2d 1289, 1292 (5th Cir.1987); *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *Garcia v. United States*, 469 U.S. 70, 75, 105 S.Ct. 479, 482, 83 L.Ed.2d 472 (1984); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975). On the plain meaning rule with regard to Bankruptcy Code interpretation, *see Patterson v. Shumate*, 504 U.S. 753, 757–60, 112 S.Ct. 2242, 2246–47, 119 L.Ed.2d 519 (1992); *Taylor v. Freeland & Kronz*, 503 U.S. 638, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992); *Union Bank v. Wolas*, 502 U.S. 151, 154–60, 112 S.Ct. 527, 529–33, 116 L.Ed.2d 514 (1991).

process, the Civil Code allows for the situation where the Louisiana legislature is other than unambiguous in its solemn pronouncements.

Article 10 of the Civil Code reads as follows: "When the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law." Article 12 of the Civil Code reads: "When the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole." Finally, abiding by its faith in the notion that the law is to be read as an organic whole, the Civil Code provides in Article 13 as follows: "Laws on the same subject matter must be interpreted in reference to each other."

▉▉▉▉ The charge to a court seeking to interpret Louisiana statutes, then, is to determine whether, in light of the generally prevailing meanings of the words of the statutes, these words are clear and unambiguous, and if so, whether giving them this effect would generate absurd consequences. If no absurd consequences would ensue, the court is bound to give legal effect to the prevailing meaning (and is not empowered to look further in divining legislative will). If the words are not clear and unambiguous, resort is necessary to the other interpretative tools and methods afforded under Louisiana law to assist the Court in divining the intent underlying this expression of legislative will.

Recall the words of the statute pursuant to which annuities, generally speaking, are exempt:

B. The lawful beneficiary, assignee, or payee, including the annuitant's estate, of an annuity contract, heretofore or hereafter effected, shall be entitled to the proceeds and avails of the contract against the creditors and representatives of the annuitant or the person effecting the contract, or the estate of either, and against the heirs and legatees of either such person, saving the rights of forced heirs, and such proceeds and avails shall also be exempt from all liability for any debt of such beneficiary, payee, or assignee or estate, existing at the time the proceeds or avails are made available for his own use.

La. R.S. 22:647(B) (1995).[78]

The statute, read plainly, exempts the proceeds and avails of the annuity contract. Period. There is no reference to the source of funds, except that the beneficiary, assignee, or payee's rights to the proceeds and avails shall be an entitlement against "the person effecting the contract, or the estate of either [the assignee, etc or the person effecting the contract], and the heirs and legatees of either such person, saving the rights of forced heirs." (This is the codification of the holding of *Succession of Rabouin.*) So, there is the prospect of a person other than the beneficiary, assignee, or payee purchasing the annuity (as there is of the purchaser being the same person—in the event the beneficiary, etc. is the annuitant's estate, upon the annuitant's death). There is no limitation as to the nature or source of funds by which the annuity is purchased. **There is no reference to limitation of the exemption on the ground that the beneficiary, assignee, or payee has a claim against the purchaser of**

---

**78.** See also, La. R.S. 22:647(C) and (D) (1995), which (as of the inception of this bankruptcy case) read:

(C) The provisions of Sub-section A and B of this section shall apply:

(1) Whether or not the right to change the beneficiary is reserved or permitted in the policy or contract; or

(2) Whether or not the policy or contract is made payable to the person whose life is insured, to his estate or to the estate of the annuitant if the beneficiary, assignee or payee shall predecease such person; except, that this Sub-section shall not be construed so as to defeat any policy or contract provision which provides for disposition of proceeds in the event the beneficiary, assignee or payee shall predecease the insured or annuitant.

(D) No person shall be compelled to exercise any rights, powers, options or privileges under any such policy or contract.

As mentioned above, Section 647 was amended in 1997, without affecting the extent to which annuities are exempt. In fact, the exemptions afforded were expanded to include Education Assistance Account depositor agreements. The full version of the section, as it now reads, is attached to this opinion as Appendix 1.

**the annuity, or that if the annuity is an "account receivable." [79]** ..

The statute applies: (1) whether or not the right to change the beneficiary is reserved or permitted in the policy or contract; (2) whether or not the policy or contract is made payable to the person whose life is insured, to his estate, or to the estate of an annuitant if the beneficiary, assignee, or payee shall predecease such person; (3) regardless of the source of the annuity; (4) whether or not the beneficiary, assignee, or payee is the owner of the annuity policy; (5) whether or not the beneficiary, assignee, or payee is the beneficiary of the annuity policy; (6) whether or not the payee himself or herself provided the "consideration" for the annuity policy; (7) whether or not the proceeds of the annuity policy are reasonably necessary for the livelihood of the beneficiary, assignee, or payee; and (8) whether or not the beneficiary, assignee, or payee has a right to pursue the fund or does not have such a right. Rather, La. R.S. 22:647 provides that the lawful beneficiary, assignee, or payee has the right to the proceeds of the annuity free and clear of the claims of creditors. *Period.* Also, no one with rights under any annuity can be compelled to exercise these rights by third parties.

As the *Abadie* court said, the statute exempts all annuities. "All" means all. Though the Court is tempted, resort to an acceptable dictionary for the definition of "all" will be resisted. Simply, simply, simply said, the Louisiana annuity exemption statute does not allow the Fifth Circuit or any other court charged with interpreting the law to make up, as the determining inquiry, whether the annuity at issue is, in reality, an account receivable, for the purpose of denying the exemption. At this point, recall, again, that *Young* dealt with an **annuity that was also an account receivable, as opposed to *Guidry*, for example, that dealt with an account agreement that could not have been an annuity because there was no transfer of ownership of the money and no obligation to pay rent.** As long as the issue remains focused, assume the annuity (which

is in reality an annuity); does the law deny the exemption if it is also an account receivable? The answer is clear: The Louisiana statute granting the exemption, *according to its terms, makes no distinction between annuities that are and annuities that are not, accounts receivable.* The statute carries in it a refutation of *Young.*

There is *no statutory basis* for carving out annuities that are also accounts receivable, unless such a carve-out is first effected by the legislature. Clearly, the exemption statute provides no data upon which to conclude that the state Supreme Court would disagree with *Abadie.*

So, there is no contrary case law, and the statute cannot be seen as a datum contrary to the holding of *Abadie.* What else is there?

Well, nothing of relevance, given Louisiana's prohibition upon looking beyond the language of statutes. Unless the statute, if read literally, with the words given their ordinary meaning, would create absurd results or consequences. Does, then, La. R.S. 22:647(B), if read to exempt all annuities, lead to such? The *Abadie* court, while decrying the result, concluded in no uncertain terms that exemption of all annuities was not an absurd result or consequence. In *Matter of Allison, supra,* the court upheld the blanket exemption of all annuities at issue, though they had clearly been purchased with the immediate (and probably sole) objective in mind of placing the purchasing assets beyond the reach of creditors. The Bankruptcy Code expressly provides for the primacy of state law in matters of exemption of property and therefore upholds, in principle, the consequential diversity. What can be absurd about a state legislature deciding to exempt a broad class of assets? Nothing.

There is no data that would insulate the Fifth Circuit from reversing itself. *Young,* if met again, would fall.

### III. *Orso* ain't *Young;* the Two are Distinguished.

---

**79.** As that term is/was defined by the law of Louisiana, or as that term was defined by the Supreme Court of Pennsylvania (which, as we shall see, is different from the Louisiana definition).

In *Young*, according to the court, the annuity was *both an annuity AND an account receivable.* Curiously, in *Young*, the Fifth Circuit did not cite Louisiana law as to the definition of account receivable (the definition source was Black's Law Dictionary). However, as luck would have it, the payment stream from the *Young* annuity was an account receivable under the Louisiana statutes.[80] Notwithstanding the foregoing attempt to show the incorrectness of *Young*, and the necessity of it being reversed if seen again by the Fifth Circuit, this court need not submit to the precedential "value" of the case, as it is factually distinguishable from this one.

On two grounds. First, this case does not involve an annuity that is also an "account receivable," as that term was and is defined in the law of Louisiana. Second, this case does not involve an attempt to defer taxes through the structuring of an otherwise taxable transaction into a deferred payment stream, whereby the taxability is limited to a payment-by-payment imposition.[81]

## A. The Louisiana Definition of "Account Receivable;" Orso's Annuities Are Not

From 1983 through 1990, the definition of "account receivable," as found in the Louisiana Assignment of Accounts Receivable Act (the "Accounts Receivable Act"), was as follows:

§ 3101. Definitions

"Accounts receivable" or "account" means and includes all or any part of any indebtedness owing to the assignor *in connection with all or any part of the assignor's business, profession,* occupation, *or undertaking, including but not limited to the sale of goods or the performance of services* or the leasing of moveable property subject to the Louisiana Lease of Moveables Act. "Accounts receivable" or "account" shall not mean or include:

(a) *Indebtedness due to or arising out of claims in tort.*

La. R.S. 9:3101(1) (1991) (emphasis supplied).[82]

Few Louisiana courts have found it necessary to construe the meaning of "account receivable," given the definition set forth in 9:3101(1). The few courts that have construed the term, however, have focused on the requisite that the indebtedness constituting an account receivable must arise out of the sale of goods or the performance of services owed to the assignor in connection with the assignor's business, profession, occupation, or undertaking.[83]

---

80. Curiously, the *Beisel* case, relied upon as establishing that an annuity which is also an account receivable cannot be an annuity, dealt with a contractual arrangement/obligation that was not an annuity contract (see discussion above), and, as well, that would not have been classifiable as an "account receivable" under Louisiana law (see discussion below).

81. We do not wish to be read as, in fact, believing these distinctions to have legal significance under the law of Louisiana as it is properly read, that all annuities are exempt. These distinctions, however, take us outside the ambit of *Young*, in the event our un-researched issue—whether a lower court is bound by a circuit decision that has been clearly contradicted by subsequent state cases—would be resolved in favor of our being bound.

82. As will be discussed *infra*, the Louisiana Assignment of Accounts Receivable was in effect when *Young* was rendered. The Accounts Receivable Act also applies to the Liberty Mutual Annuity and the Western National Annuity, as they were purchased pursuant to the Tort Settlement in September, 1989, when the Accounts Receivable Act was still in effect. Section 3101 of the Act, defining "accounts receivable" and "account," was repealed effective July 1, 1989,

but the effective date of such repeal was delayed until January 1, 1990.

On January 1, 1990, Article 9 (entitled "Secured Transactions") of the Uniform Commercial Code replaced the Accounts Receivable Act. Section 9–106 of Article 9 is strikingly similar to La. R.S. 9:3101 in the emphasis upon services rendered, and provides as follows:

"Account" means any right to payment for goods sold or leased or *for services rendered* which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance. * * *

La. R.S. 10:9–106 (1993) (emphasis supplied). The similar focus in La. R.S. 9:3101 and 10:9–106 upon "services rendered" strongly suggests that the Louisiana legislature intended to retain this component of the definition of "accounts receivable" or "account" in 10:9–106 and also suggests the importance of this component to the definition.

83. *See, e.g., In re Leblanc & Associates,* 77 B.R. 539 (Bankr.W.D.La.1987) (architectural work performed by the debtor clearly fell within the definition of "accounts receivable" in La. R.S. 9:3101, which defined "accounts receivable" and "account" to include indebtedness for the perfor-

In 1993, the Fifth Circuit, in *T–H New Orleans Limited Partnership v. Financial Security Assurance, Inc. (Matter of T–H New Orleans Limited Partnership)*, 10 F.3d 1099, *cert. denied*, 511 U.S. 1083, 114 S.Ct. 1833, 128 L.Ed.2d 461 (1994), had the opportunity to focus on the definition of "account receivable" in 9:3101(1). The issue before the court was whether post-petition hotel revenues were "rent" for the purposes of § 552(b) of the Bankruptcy Code, or were "accounts receivable," within the meaning of 9:3101(1). The debtor contended that hotel revenues were "accounts receivable" under the Louisiana Accounts Receivable Act, arguing that hotel revenues were dependent upon and generated from the service aspect of the hotel, and, as such, were in the nature of accounts receivable. *10 F.3d at 1105–06.*

The Fifth Circuit disagreed, because the definition of "account receivable" in 9:3101(1)(c) expressly excluded "[i]ndebtedness due to or arising out of the leasing of immoveable property," and also because the physical condition of the hotel and its location were more essential to the hotel's ability to generate revenue than were the services the hotel provided. *Id.* at 1106. In so holding, however, the Fifth Circuit *did not* disclaim the requirement of the "performance of services," as set forth in 9:3101(1). The Fifth Circuit merely found that the services rendered by the hotel did not generate the indebtedness. Therefore, in construing the term "accounts receivable," within the meaning of 9:3101(1), it continues to be appropriate to focus on, *inter alia*, services rendered.

So, we see that the *Young* annuity was, in fact, an "account receivable" under Louisiana law. According to the court, this fact distinguished the *Young* annuity from one entitled to exemption. As the Fifth Circuit was charged with interpreting Louisiana law, we must surmise that although the court did not see fit to cite Louisiana law on the question of whether the annuity was an account receivable, it must have known that the generalized definition of the term, found by the court in Black's Law Dictionary, comported with the one found within the state law the court was interpreting. Recalling that earlier in this opinion we have mentioned that the contractual arrangement*obligation dealt with in the *Beisel* case, used by the court as authority for its charge, its analytical method and its conclusion, would not constitute an account receivable under Louisiana law, it occurs to us that an explanation is perhaps due as to how we can conclude that the Fifth Circuit had Louisiana law in mind in its references to the term "accounts receivable."

An explanation is easy. The court could not have been using such a term with no thought as to what it meant under the law being interpreted. The court was correct that the *Young* annuity was in fact an "account receivable" under the law of Louisiana. The account receivable finding was pivotal to the court's overall conclusion (no exemption). Because of all this, the court's reference to and determination based upon the Pennsylvania state court decision is to be interpreted as the conclusion that IF AN OBLIGATION IS AN ACCOUNT RECEIVABLE UNDER APPLICABLE STATE LAW, THE CONTRACTUAL ARRANGEMENT IS NOT AN ANNUITY, REGARDLESS OF THE FACT THAT THE FORM OF THE OBLIGATION IS AN ANNUITY CONTRACT. (Emphasis supplied). This is not the same conclusion as that the court follows the state law of Pennsylvania, as to what an "account bearing interest" is, for purposes of determining whether a Louisiana contract is an annuity. Had the Fifth Circuit concluded that **any obligation** preceding the formation

---

mance of professional services); *In re RDR Systems Development, Inc.*, 57 B.R. 540 (Bankr. M.D.La.1986) (debtor's assignment of accounts receivable was effective with regard to sums due under a contract to debtor, as La. R.S. 9:3101 defines "account receivable" to mean any indebtedness due to or arising out of the sale of goods or the performance of services); *Associates Financial Services, Inc. v. McClendon*, 367 So.2d 91 (La.App. 4th Cir.1979) (between an employee and an employer, there was no "account," within the meaning of 9:3101, because there was no indebtedness arising out of the assignor's business or undertaking, and therefore an employee's assignment of his future wages to the bank was not an assignment of accounts receivable); *Bossier Bank & Trust Co. v. Natchitoches Development Co.*, 272 So.2d 731 (La.App. 3rd Cir.1973) (indebtedness owed by contractor to subcontractor constituted an "account receivable," arising out of a business or profession, within the meaning of La. R.S. 9:3101).

of the annuity arrangement would preclude the formation of the annuity contract would preclude the annuity from being an annuity under Louisiana law, it could have done so, and would not have used the legally defined term, "account receivable."

Notwithstanding our conclusion that the court was incorrect in posing the account receivable/annuity distinction, we do not have an account receivable here. Simple juxtaposition of the *Young* arrangement will establish this.

The *Young* annuity arose as a result of the assumption, by the Underwriter, of the attorneys fees owed by the clients to Young. Therefore, unless the assumption of the indebtedness changed the nature of the indebtedness, the annuity contract was the mechanism for the payment of legal fees due, arising out of Young's having providing services as a lawyer to his clients. This type of obligation falls squarely within the definition of "account receivable." [84] Orso's annuities represent the method by which the settlement and compromise liability of the alleged tortfeasors was, after assumption by the Underwriter, to be paid to him. Therefore, unless assumption by the Underwriter changed the nature of the obligation assumed, the obligation falls squarely within the "[i]ndebtedness due to or arising out of claims in tort" exclusion from the definition of accounts receivable. This, of course makes sense.

*Lawyers* handle cases, *lawyers* represent clients, *lawyers* generate fees, *lawyers* send bills; this is the ordinary course of business for *lawyers*, where the lawyer operates his or her business, bills clients, receives money, and pays taxes. Lawyers, therefore, when conducting their business, are participating in commerce, through their contractual relations with their clients. The obligations of those who are represented, generated in the conduct of business are the accounts of the business, part of the capital structure of the business (to be found within the business's balance sheet). This type of business-generated account is commonly used in commerce to secure credit, leases, etc. This is an account receivable.

Look, however, at Orso. He went out in a car, got hit, and became a completely different person, one who was, is and will be unable to conduct any business. Certainly it cannot be said that the obligation underlying the annuities arose as a result of Orso providing goods or providing services. Clearly, the obligation did not arise as a result of the operation, by Orso, of his business, unless it can be said that operation of his business consisted of being blamed while driving his car, of being comatose for days, of emerging as a person whose brain no longer works like it did, of being rendered, in fact, someone else.

It can be said, with some degree of understatement, that there appear to be significant differences between depriving the obligee of an account receivable of the annuity-based exemption, and depriving the interdicted obligee of a tort claim of the annuity-based exemption (in fact, consider whether there is a better reason to establish an annuity with a beneficiary or payee being other than the purchaser, than to provide for someone horrifically injured—who turns out to need interdiction for the balance of his life).[85]

---

84. The obligation underlying the *Young* annuity would have also qualified as an "open account" under La. R.S. 9:2781, which provides for attorneys fees for collection of "open accounts" in default. The definition of " 'Open Account' includes any account for which a part or all of the balance is past due, whether or not the account reflects one or more transactions and whether or not at the time of the contracting the parties expected future transactions. 'Open Account' shall include debts incurred for professional services, including but not limited to, legal and medical services . . ." La. R.S. 9:2781(C).

85. What about the argument that because Louisiana does not exempt tort settlements, that annuities arising from tort settlements are, likewise, non-exempt? First, the annuity exemption statute places no limitation upon the source of funds used to purchase the annuity. Second, and this is a variation on this court's response to the *Young* court's aversion to Young deferring taxation of his fee—a variation, because as we shall see, Orso avoided **no** taxation by means of the annuity—a tort victim who receives his settlement by means of an annuity, gives up the right to collect the claim in one lump sum, to do with what he might wish. Recall a basic law of nature: Annuities are not a "fundamental component of the earth, which preexist humankind." Annuities are *made*, by people, through the use of money, almost always non-exempt money, which

The Debtor's structured settlement is repayment for, in essence, the Debtor's *life*, because the Debtor as he was pre-accident *no longer exists*. All he, his family, and his friends are left with is the Debtor as he is post-accident: severely impaired and needing protection from himself. This is not what the Fifth Circuit was concerned with in *Young*, attorneys who turn their accounts receivable into annuity contracts so that the attorneys can protect the entirety of their business income from seizure from their creditors, and at the same time obtain tax relief because they receive a cash monthly payment stream.[86]

## B. Federally-protected Tax Incentives— 26 U.S.C. §§ 104 and 130; Orso Received No Inordinate Tax Benefits by Means of the Annuities

Recall the Fifth Circuit's chagrin at Young having structured the receipt of his fee so that he could avoid the imposition of full taxation of the entire fee amount by means of the annuity. What about Orso? Not the same situation. First of all, the Internal Revenue Code excepts from gross income amounts received on account of claims such as that held by Orso, so his accepting the structured annuities did not absolve him of any tax consequences that might otherwise

attend receipt of a lump sum. Section 104(a)(2)[87] of the Code provides:

**Section 104. Compensation for injuries or sickness.**

> (a) In general.—Except in the case of amounts attributable to (and not in excess of) deductions allowed under section 213 (relating to medical, etc., expenses) for any prior taxable year, gross income does not include—
>
> \* \* \* \* \* \*
>
> (2) the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness.

Is there any doubt that Orso's damages would have fit within this exclusion? No.

Also, the Internal Revenue Code provides a federally generated incentive to utilize the structured settlement/annuity vehicle, by reaffirming that periodic payments of moneys that would be excludable from gross income under 26 U.S.C. § 104 are also excludable, and by making certain that Intermediaries or Underwriters who participate in annuity-based structured settlements are protected from having to claim as gross income the amounts received to purchase an-

---

is paid to someone who thereafter owes the annuity obligation. The annuity, once effective, is exempt. It is nonsensical to reason that one cannot have an exemption for an annuity because it is derived from a non-exempt asset. Looked at closely, the argument that the non-exempt status of tort recoveries precludes exemption through annuities is, nonsensically, nothing other than a recasting of the "got to start exempt to stay exempt" argument.

**86.** Canfield has suggested that the annuity-funding mechanism is solely for the benefit of the tortfeasors, rather than for the benefit of Orso, and that the distinction between lawyer account receivable and tort victim's annuity is one without a difference. Without suggesting that this court understands this argument, it is clear that while the structured settlement might, at first blush, give the impression that the tortfeasor has "gotten away" with a reduced liability, if the tort victim is properly represented, the payment stream should approximate the discounted value of the claim. A settlement like Orso's really helps people like Orso, who, given their post-tort condition, have no business being put in charge of huge sums of money, which are huge (or

would be if paid in lump sum) because of the extent of damage, and are to be used to support the hurt person for his life. Remember, the evidence has conclusively established that a structured settlement for Orso was necessary, for the recovery to be counted on for Orso's future, because the Debtor was rendered incapable of handling his affairs, much less, large sums of money. Even with the structured settlement, the Debtor often spent all of his money before his next monthly payment was due, thus requiring his interdiction and the appointment of his mother as his limited curatrix.

**87.** The United States Supreme Court recently reaffirmed the policy of excluding income received on account of personal injuries from tax liability under § 104 of the Internal Revenue Code. In *Commissioner v. Schleier*, 515 U.S. 323, 115 S.Ct. 2159, 132 L.Ed.2d 294 (1995), the Court reversed the Fifth Circuit and established a new test for exclusion of income under § 104(a)(2), holding that to establish excludability, a taxpayer must show that the underlying cause of action is based upon tort or tort-like rights, and that damages were received on account of personal injuries or sickness.

nuities to satisfy the obligations assumed from the tortfeasor to the victim. Section 130 of the Internal Revenue Code reads as follows:

## Section 130. Certain personal injury liability assignments.

(a) In general.—Any amount received for agreeing to a qualified assignment shall not be included in gross income to the extent that such amount does not exceed the aggregate cost of any qualified funding assets.

(b) Treatment of qualified funding asset.—In the case of any qualified funding asset—

(1) the basis of such asset shall be reduced by the amount excluded from gross income under subsection (a) by reason of the purchase of such asset, and

(2) any gain recognized on a disposition of such asset shall be treated as ordinary income.

(c) Qualified assignment.—For purposes of this section, the term "qualified assignment" means any assignment of a liability to make periodic payments as damages (whether by suit or agreement) on account of personal injury or sickness (in a case involving physical injury or physical sickness)—

(1) if the assignee assumes such liability from a person who is a party to the suit or agreement, and

(2) if—

(A) such periodic payments are fixed and determinable as to amount and time of payment,

(B) such periodic payments cannot be accelerated, deferred, increased, or decreased by the recipient of such payments,

(C) the assignee's obligation on account of the personal injuries or sickness is no greater than the obligation of the person who assigned the liability, and

(D) such periodic payments are excludable from the gross income of the recipient under section 104(a)(2).

The determination for purposes of this chapter of when the recipient is treated as having received any payment with respect to which there has been a qualified assignment shall be made without regard to any provision of such assignment which grants the recipient rights as a creditor greater than those of a general creditor.

(d) Qualified funding asset.—For purposes of this section, the term "qualified funding asset" means any annuity contract issued by a company licensed to do business as an insurance company under the laws of any State, or any obligation of the United States, if—

(1) such annuity contract or obligation is used by the assignee to fund periodic payments under any qualified assignment,

(2) the periods of the payments under the annuity contract or obligation are reasonably related to the periodic payments under the qualified assignment, and the amount of any such payment under the contract or obligation does not exceed the periodic payment to which it relates,

(3) such annuity contract or obligation is designated by the taxpayer (in such manner as the Secretary shall by regulations prescribe) as being taken into account under this section with respect to such qualified assignment, and

(4) such annuity contract or obligation is purchased by the taxpayer not more than 60 days before the date of the qualified assignment and not later than 60 days after the date of such assignment.[88]

---

88. The legislative history of the sections corroborates this court's interpretation of the basis for the law. According to the Senate Report.

Reasons for Change

Despite several revenue rulings that indicate that the Internal Revenue Service considers that periodic payments as personal injury damages are excludable from the gross income of the recipient, the Committee believes it would be helpful to taxpayers to provide statutory certainty in the area. Likewise, the Committee believes that a person who undertakes an assignment of the liability for such payments from the person originally liable should not include amounts received for doing so in gross income to the extent that those amounts are

Both the Liberty Mutual Annuity and the Western National Annuity were structured so as to fall within the protection of §§ 104 and 130 of the Internal Revenue Code, so that as broadly as possible, the proceeds of the annuities would be excluded from Orso's gross annual income for tax purposes, and the other parties could receive any benefits afforded by the Code.[89] (Of course, it is not this Court's responsibility to determine whether the Liberty Mutual Annuity and the Western National Annuity successfully fall, as a matter of law, within the confines of these provisions, although it appears that the annuities in fact are covered).

The fact that Orso and the other parties to the settlement chose to structure the settlement so as to fall within the confines of §§ 104 and 130 of the Tax Code, without *Young*, would be immaterial as regards the question of whether the proceeds of the Orso annuities are exempt under La. R.S. 22:647. However, given *Young*, it is necessary to mention that Orso avoided no taxation by accepting the annuities. In fact, he and the other parties did their best to comply with the Federal law expressly reflecting Congressional intent favoring the very arrangement agreed to. We cannot say that Mr. Young's annuity was so smiled upon. In fact, the Fifth Circuit is probably correct in its assertion that Young was able to defer taxation through the annuity, so that it was absolutely necessary that Young **not** receive the lump sum payment of his fees (from either his clients or the Underwriter). However, this is not the case with Orso, as there would

have been no taxation difference had he purchased the annuities with the proceeds of a lump sum settlement. The damage settlement is not taxable. He defers nothing. So, while this court adheres to its suggestion that *Young* is incorrect, the taxation consequences avoided by Young, but inapplicable to Orso, further distinguish the two situations, and for this additional reason, render *Young* inapplicable, as precedent.

**IV. Canfield's Confusion is the Confusion Engendered by *Young;* Her Cases are Shown to be Inapplicable to the Louisiana Statute.**

Canfield has cited the court to the following cases for the proposition that *Young* mandates that the proceeds of the Orso annuities are merely accounts receivable and therefore are not exempt under La. R.S. 22:647: *In re Rhinebolt*, 131 B.R. 973 (Bankr.S.D.Ohio 1991); *In re Johnson*, 108 B.R. 240 (Bankr.D.N.D.1989); and *In re Simon*, 71 B.R. 65 (Bankr.N.D.Ohio 1987). As will be seen, however, in each of these cases the debtors claimed an exemption of the proceeds of annuities under statutes which are similar to La. R.S. 20:33 (dealing arguably with pensions, retirement annuities, and employer gratuity payments) and which differ significantly from La. R.S. 22:647, which is virtually unlimited in scope.

The *Rhinebolt* court, relying upon *Young*, held that an "annuity" which was part of a structured settlement agreement in a personal injury suit could not be claimed as exempt under an Ohio exemption for annuities, because the "annuity" was not in the nature of

---

used merely to purchase certain types of property to specifically cover the liability.
Explanation of Provision
 The Bill specifically provides that the Code section 104 exclusion from gross income of damages for personal injuries or sickness applies whether the damages are paid as lump sums or as periodic payments. This provision *is intended to codify, rather than change, present law.* Thus, the periodic payments of personal injury damages are still excludable from income only if the recipient taxpayer is not in constructive receipt of or does not have the current economic benefit of the sum required to produce the periodic payments. *See* Rev. Rul. 79–220 and Rev. Rul. 77–230.
 The Bill also adds a new section to the Code providing that, under certain circumstances,

an amount received for agreeing to undertake an assignment of a liability to make periodic payments of personal injury damages is not included in gross income. Specifically, any amount so received will not be included in gross income to the extent it is used to purchase an annuity contract of a life insurance company . . .
S.Rep. No. 646, 97th Cong., 2nd Sess. (1982).

89. In fact, the Liberty Mutual Agreement between the Debtor and Cook Construction/Liberty Mutual provided that Cook Construction or Liberty Mutual had the right to "fund Periodic Payments [to the Debtor] by purchasing a 'qualified funding asset.' within the meaning of Section 130(d) of the Internal Revenue Code, in the form of an annuity payments."

future earnings, but was set up simply to provide a method by which to fund the settlement of the debtor's tort lawsuit. According to the court, the "annuity" appeared to be one in name only and in reality was more closely related to an account receivable. The Ohio exemption statute in *In re Rhinebolt* provided an exemption: (1) for a "person's right to receive payment under any pension, annuity, or similar plan or contract, ... on account of illness, disability, death, age, or length of service, to the extent reasonably necessary for the support of the person and of any of his dependents"; and (2) where the annuity "has been taken out for the benefit of, or made payable by change of the beneficiary, transfer, or assignment to, the spouse or children or any relative dependent upon **such** person, or any creditor." *Rhinebolt,* 131 B.R. at 975, 977 (*quoting* Ohio Revised Code § 2329.66(A)(10)(b) and (A)(6)(b)).

The *Johnson* court, relying upon *Young,* held that a structured settlement agreement represented installment payments on the underlying debt between the debtor and the insurer by way of the settlement agreement, and thus under North Dakota law was exempt only to the extent allowed for payments made on account of personal bodily injury, rather than for payments made pursuant to annuity policies. The exemption statute in *Johnson* provided that the proceeds of annuities were exempt, *but grouped annuities under the heading "Pensions",* along with life insurance policies, investment retirement accounts, Keogh's and simplified employee benefit plans. *Johnson,* 108 B.R. at 241.

In *Simon,* the court, relying upon *Young,* held that the Ohio statute exempting payments under a pension, annuity, or similar plan or contract on account of an illness, disability, death, age, or length or service, did not permit an exemption of an annuity which was used to fund a structured tort settlement. *Simon,* 71 B.R. at page 66.[90]

This court believes that Canfield's reliance on these cases is misplaced. In *Young,* it will be recalled, the attorney-debtor relied upon La. R.S. 20:33 and 22:647 for his proposition that the proceeds of his annuities were exempt. The *Young* court, however, did not engage in *any* statutory interpretation of these provisions, but rather engaged in a theoretical endeavor to determine the ephemeral distinction between annuities and accounts receivable. Therefore, *Young* has little, if any, precedential or persuasive value with regard to the statutory interpretation of either of these provisions.

Given the limited scope of the exemption statutes in *Rhinebolt, Johnson,* and *Simon,* this court believes that those courts relied unnecessarily on *Young.* The statutes in these cases are quite similar in scope to La. R.S. 20:33, which, unlike La. R.S. 22:647, can arguably be seen as limited to employer/employee pensions, retirement plans, gratuity payments, and retirement annuities-as well as IRA's. It is not surprising to this court that the *Rhinebolt, Johnson,* and *Simon* courts were reluctant to extend the protection of these statutes to the proceeds from annuities purchased pursuant to tort settlements. While *Rhinebolt, Johnson,* and *Simon* might be considered by this court were the Debtor claiming an exemption under La. R.S. 20:33, the Debtor has claimed an exemption under La. R.S. 22:647, not under 20:33. Therefore, this court deems the reasoning in *Rhinebolt, Johnson,* and *Simon* to be irrelevant to the proceeding before it.

**90.** See also, *Matter of Wommack,* 80 B.R. 578 (Bankr.M.D.Ga.1987). In this case, a Chapter 13 debtor claimed his one-half interest in an annuity based upon a structured settlement for the wrongful death of the debtor's minor son; the Georgia statute exempted the debtor's right to receive payments "under a pension, an annuity, or similar plan or contract on account of illness, disability, death, age, or length of service, to the extent reasonably necessary for the support of the debtor and any dependent of the debtor." *Id.* at 579 (*quoting* § 44–13–100(a)(2)(E) of the Georgia Code). The court, noting that *"the test for exemptibility focuses on the terms and restric-*

*tions governing the administration of the plan or contract, rather than the source of the funds in the account," id.* at 580 (emphasis supplied), rejected the trustee's argument that the settlement award was not equivalent to future wages. The court reasoned that under the terms of the annuity, the debtor had no right to withdraw funds beyond the present monthly allotment and could not cash in the annuity. Therefore, the court held that the annuity was in nature of future earnings, and because the annuity had been issued in consideration of the debtor's age, the annuity qualified for exemption under the Georgia statute.

## V. We Look for Help From Other Places and Find It; *Matter of McCollam*

### A. The *McCollam* Decisions

The court finds intellectual comfort in the fact that it is not alone in limiting the effect of *Young* to annuities which *also* are accounts receivable, without annuity contracts. Indeed, the Eleventh Circuit and the Florida Supreme Court also have read *Young* similarly, and although the court is not bound by Eleventh Circuit precedent, the court will be so bold as to rely upon the Eleventh Circuit's jurisprudence as a "beacon" in the murky waters which the court has traversed thus far.

Therefore, the court will examine the Eleventh Circuit case, which is the culmination of an extended trip up, down and sideways within the appellate and certification process, and which thoughtfully considered the very issues now before the court. In doing so, the court will focus upon *In re McCollam*, 612 So.2d 572 (1993) and *In Re McCollam*, 986 F.2d 436 (11th Cir.1993), which witness a labyrinth of procedural history from the Florida bankruptcy court, to the Eleventh Circuit, to the Florida Supreme Court, and back to the Eleventh Circuit. Perhaps the lessons of *McCollam* will shield this court, the Debtor and Canfield from a similar procedural history.

In *McCollam*, the issue was whether, as a matter of law, an annuity contract which was established in lieu of a creditor paying a debtor a lump sum presently owed was exempt from creditor claims in bankruptcy under the Florida statutory exemption provision. The *McCollam* case originated in bankruptcy court, which found the structured tort settlement to be exempt. *In re McCollam*, 110 B.R. 599 (Bankr.S.D.Fla.1990). The district court affirmed. 118 B.R. 129 (S.D.Fla.1990). The Eleventh Circuit certified the question to the Florida Supreme Court, 955 F.2d 678 (11th Cir.1992). The Florida Supreme Court held the annuity was exempt. 612 So.2d 572 (Fla.1993). The Eleventh Circuit affirmed the district court's decision. based upon the Florida Supreme Court's decision. 986 F.2d 436 (11th Cir. 1993).

In the bankruptcy court decision, 110 B.R. 599 (Bankr.S.D.Fla.1990), a Chapter 7 debtor claimed Florida's statutory exemption for the "proceeds of annuity contracts issued to citizens or residents of the state," with regard to an annuity contract which had been purchased by Travelers Insurance Company ("Travelers") to provide payments in connection with a structured tort settlement for the debtor, who was the surviving child of an individual whose death provided the family members with a claim against the insurer. The Florida statute, like La. R.S. 22:647, was broad and unlimited and provided as follows:

> The cash surrender values of life insurance policies issued upon the lives of citizens or residents of the state *and the proceeds of annuity contracts issued to citizens or residents of the state,* upon whatever form, *shall not in any case be liable to attachment, garnishment or legal process in favor* of any creditor of the person whose life is so insured or *of any creditor of the person who is the beneficiary of such annuity contract,* unless the insurance policy or annuity contract was effected for the benefit of such creditor.

Fla. Stat. Ann. § 222.14 (West 1990) (emphasis supplied). Thus, the *only* limitations set forth in the Florida statute were that: (1) an "annuity contract" must have been issued to the debtor; (2) the debtor was a resident of the state; and (3) the debtor was a beneficiary of the annuity contract.

The *McCollam* debtor was the beneficiary under the annuity contract. McCollam's objecting creditor had a claim against the debtor arising from an automobile accident that had occurred two years *after* the annuity contract had been established.

The *McCollam* bankruptcy court first noted the "important consideration," 110 B.R. at 600, that there was no reliance by the objecting creditor or any other creditor on existing funds of the debtor which were placed beyond the reach of creditors by the purchase of the annuity. The court then relied favorably upon *In re Benedict*, 88 B.R. 387 (Bankr.M.D.Fla.1988), in which it was held that annuities issued pursuant to the terms of a structured injury tort settlement agreement in favor of the debtor's husband could

be claimed as exempt by the debtor under the Florida statute, even though the debtor was not designated as owner of the policy. The *McCollam* court noted that *Benedict* was "exactly on point," *id.* at 601, and found that although McCollam did not own the annuity, it was McCollam who had the right to receive the annuity payments and to change beneficiaries, which were the direct benefits provided by the annuity.

The *McCollam* bankruptcy court also distinguished *Young* on the following grounds:

> I am convinced from the fact of the humanitarian loss for which the annuity compensates this debtor that there can be no suggestion of fraud or any improper conduct by the debtor to avoid creditors in establishing the annuity. Therefore, the policy argument set forth in the objector's Brief which compares the debtor's annuity to an annuity purchased to pay off a lottery debt or a lawyer's fee is totally unrelated to the facts here. The debtor is not an attorney collecting an account receivable and therefore *In re Young*, cited by the creditor, is not applicable to the facts before me.

*Id.* (citation and footnote omitted). Finally, the bankruptcy court rejected the creditor's argument that the annuity contract was motivated by tax considerations. The court found that such considerations had "no bearing on the debtor's entitlement to claim the statutory exemption," *id.*, given the well-established principle that exemption statutes should be liberally construed in favor of the debtor so that the debtor and his or her family will not become public wards.

The district court affirmed the bankruptcy court and held that the debtor's annuity contract was exempt property under the Florida exemption statute. 118 B.R. 129 (S.D.Fla. 1990). The court found that a "strict reading" of the Florida statute, *id.* at 130, accompanied by the court's review of the facts, compelled the court's holding that the annuity contract issued to the debtor pursuant to the tort settlement was an "annuity contract" within the meaning of the Florida statute.[91]

In so holding, the court rejected the arguments of the creditor that the debtor was merely a third-party beneficiary who had no property interest in the annuity, that the annuity obligation itself was not claimed to be exempt under bankruptcy law because the obligation was secured by an annuity owned by Travelers, and that the debtor was merely investing in a personal injury tort settlement which was a tax shelter. *Id.* at 131.

The Eleventh Circuit, rather than ruling on the issue before it, certified the following issue to the Florida Supreme Court:

> WHETHER AS A MATTER OF LAW, AN ANNUITY CONTRACT WHICH IS ESTABLISHED IN LIEU OF A CREDITOR PAYING A DEBTOR A LUMP SUM PRESENTLY OWED IS EXEMPT FROM CREDITOR CLAIMS IN BANKRUPTCY UNDER FLA. STAT. § 222.14.

955 F.2d 678, 681 (11th Cir.1992). In giving its reasons for certification, the court stated:

> The Florida statute, on its face, appears to exempt all annuity contracts from creditor claims in bankruptcy, regardless of the underlying obligations that the contracts represent. Appellant, however, presents a viable argument against such a literal interpretation of this statute. He argues that allowance of the exemption at issue here "leads the debtor to gloss over an asset: her claim against Travelers." Appellant reasons that without the existence of the original debt owed by Travelers to McCollam [the debtor], there never would have been an annuity. The annuity, he continues, is merely a means to secure a steady stream of payments of a debt. Appellant emphasizes that while the debtor listed the annuity as an *exempt* asset, she did not list the debt from Travelers among her assets. He concludes that the debt owed to the debtor by Travelers is non-exempt property of McCollam's bankrupt estate. The fact that an annuity provides the schedule of payments for that debt does not, he argues, mean that the debt, the annuity, and the payments thereunder are exempt from the claims of general

---

91. The court also noted that "[t]he annuity itself is not what is exempted" by the Florida statute, but rather "[t]he proceeds from the annuity con- tracts, because they are paid directly to a beneficiary who is a Florida resident, are protected from exemption." 118 B.R. at 131.

unsecured creditors of the debtor's bankrupt estate. The bankruptcy court's opinion in *In re Vincent R. Benedict,* on which the district court relied in this case, is factually similar to this case.... A Florida court may find the reasoning of the court in *In re Benedict* unpersuasive. Appellant states that the annuity paid by Travelers to McCollam is, in substance, a tort settlement of a debt, merely structured as a stream of payments. The case is similar, in this respect, to *Matter of Young,* .... Having found no Florida court decision that speaks to the issue in this case, we determine that it is appropriate for the highest court of Florida to determine whether the Florida Legislature intended that Ms. McCollam and others similarly situated have lifetime exemptions from levy or garnishment under this circumstance. That is, is it appropriate for the highest court of Florida to determine whether the intent of the legislature is to exempt from the claims of creditors in bankruptcy annuities in the nature of retirement instruments, or all debts structured as annuities, including those that derive from personal injury tort settlements.

*McCollam,* 955 F.2d at 680–81 (footnotes and citation omitted). The Eleventh Circuit affirmed the district court's holding, 986 F.2d 436 (11th Cir.1993), based upon the opinion of the Supreme Court of Florida, 612 So.2d 572 (Fla.1993), which was appended to the Eleventh Circuit's affirming opinion. In its opinion, the Florida Supreme Court first noted the rule of statutory interpretation that

"when the language of a statute is clear and unambiguous and conveys a clear meaning, the statute must be given its plain and ordinary meaning," 612 So.2d at 573, and further stated that the Court would "not go beyond the plain and ordinary meaning of the words used in the statute unless an unreasonable or ridiculous conclusion would result from a failure to do so." *Id.*

The Court then focused on the language of the Florida statute which provided that "proceeds of annuity contracts ... upon whatever form, shall not in any case be liable to attachment, garnishment or legal process in favor of any creditor." *Id.* The Court interpreted this provision as clearly exempting *all* annuity contracts from creditor claims, and then focused on the meaning of "annuity contracts" as used in the statute. *Id.* at 573–74. Noting that the Florida legislature had not defined this term in this provision, the Court looked to the definition of annuities in other Florida statutes, other cases from different jurisdictions (including a case which relied upon *In re Talbert*), and Black's Law Dictionary. Using these definitions "as a guide to the plain and ordinary meaning of annuity," [92] 612 So.2d at 574, the Court found that the contract at issue was an annuity and therefore the contract was exempt under the Florida exemption statute from creditor claims. In so holding, the Court noted that "had the legislature intended to limit the exemption to particular annuity contracts, it would have included such restrictive language when the statute was amended to include annuity contracts." [93] *Id.*

Interpreting the statute to exempt the glorified account receivable in the instant case violates the legislature's intent and unjustly deprives LeCroy [the creditor] of what he is legally entitled to under federal and state bankruptcy law. Legislative intent aside, while the payments McCollam claims to be exempt may technically be proceeds of an "annuity contract," they are, in substance, a structured account receivable. The substance of the arrangement, rather than the label affixed to it, determines whether the payments are exempt as proceeds from an annuity, or an account receivable, and part of the bankruptcy estate. *See In re Young* ...; *see also Beisel* [the Pennsylvania Supreme Court case cited in *Young*].... Thus, even assuming that [the Florida statute] is plain on its face and applica-

**92.** We have done something of the same thing, but have focused on the Louisiana Civil Code articles defining annuity.

**93.** In a dissent in which two other justices concurred, Justice McDonald of the Florida Supreme Court argued that the term "annuity contract" was elusive and ambiguous, but that such ambiguity was resolved by the legislative history of the Florida statute. Justice McDonald found that, in his opinion, the legislative history of the provision suggested that the Florida legislature intended to expand the scope of this provision to the same extent that it had expanded the insurance code's definition of "life insurance," and that the only annuity contracts exempt under the provision were those that involved the insurance of human lives. He also stated:

## B. After *McCollam,* in *In re Solomon;* the Eleventh Circuit Speaks to the Importance of the Annuity Contract

In *In re Solomon,* 95 F.3d 1076 (11th Cir.1996), the Eleventh Circuit revisited its *McCollam* decision, through a perspective of different facts.

Solomon, the debtor, had settled a tort suit pre-petition with Union Mutual, which provided that Union Mutual would pay, over time, a stream of payments and a final lump sum. As well, Union Mutual agreed to pay Solomon's attorney's fees. To secure the payment obligations of the settlement agreement, Union Mutual was **required** to purchase an annuity and did so from Transamerica Annuity Service Corporation. Unlike Young and Orso, Solomon had no interest whatsoever in, to, or upon the annuity. Rather, Union Mutual was both the owner and the payee of the annuity.

Solomon subsequently filed bankruptcy, claiming the annuity contract and the payment streams under the settlement agreement as exempt under the Florida statute exempting proceeds of annuity contracts.

The bankruptcy court had denied the exemption, finding that Solomon had no interest in the annuity contract. 166 B.R. 998 (Bankr.S.D.Fla.1994). On appeal to the district court, Solomon argued that the court should focus *not on the annuity* that Union Mutual, the insurer, had purchased from Transamerica, but rather on the *tort settlement agreement itself* between Solomon and Union Mutual. 186 B.R. 535 (S.D.Fla.1995). Accordingly, the issue before the district court was whether the tort settlement agreement itself constituted an annuity contract which fell within the protection of the Florida statute.

The district court concluded that pursuant to the "broad definitions of annuity utilized in *McCollam,*" 186 B.R. at 537, and given the "irrelevance of the purpose and source of funds," *id.,* at 538, the structured tort settlement agreement in fact was an annuity.[94] The court reasoned that the agreement was a contract pursuant to which Union Mutual paid Solomon monthly payments of a fixed sum for a term of ten years, and that Solomon was "the beneficiary trying to exempt the proceeds from the reach of his creditors." *Id.* at 537. Therefore, the court found that the settlement agreement itself constituted an annuity under the Florida statute. Believing that it was following *McCollam,* the district court concluded that the proceeds of the settlement agreement in *Solomon* constituted the proceeds of an annuity contract which were exempt under the Florida statute. Because the payment of attorney's fees, however, was separate and distinct under the settlement agreement and the agreement did not specify a time for payment of the fees, the court found that such fees warranted separate treatment and were not exempt.

The Eleventh Circuit reversed the district court, in part, holding that the payments/payment obligations under the settlement agreement were not proceeds of an annuity contract. 95 F.3d at 1078. In so holding, the court says

> We recognize that the Florida Supreme Court has broadly defined [the applicable

---

ble to the proceeds of annuity contracts, I would hold that Travelers Insurance Company's monthly payments to McCollam merely constitute installment payments on an account receivable, not an annuity contract within the scope of the statute.

*McCollam,* 986 F.2d at 439.

**94.** The court therefore declined to follow *In re Pizzi,* 153 B.R. 357 (Bankr.S.D.Fla.1993). In *Pizzi,* the court held that the debtor's lottery winnings were not exempt under the Florida statute, and cautioned that the Florida Supreme Court's *McCollam* decision:

> ... should not be extended further to enable debtors to exempt payment streams that are not payments under an actual annuity con-

tract.... [Unlike *McCollam,*] [h]ere, the income stream flowing directly to the Debtor is not an annuity at all. The monies are prize winnings stemming from the winning of the lottery.... The only annuity contract here is the annuity purchased by the State of Connecticut for its benefit and ... the Debtor is not a beneficiary of that contract.... [Nevertheless,] [a]s [the Florida statute] now reads and as it has been interpreted by the Florida Supreme Court [in *McCollam* ], the payment of lottery winnings, litigation settlements and other obligations through the vehicle of an annuity could allow debtors to successfully exempt the payments in a bankruptcy case.

*Pizzi,* 153 B.R. at 362–63.

458

statute] to include "all annuity contracts," stating that "had the legislature intended to limit the exemption to particular annuity contracts, it would have included such restricted language . . ." But the statute dos not shield all debts on " 'accounts receivable' structured to resemble annuities from a debtor's bankrupt estate. We read *McCollam* to require the existence of an actual annuity **contract** before a series of payments may be exempt. . . ."

*Id.* (citations omitted; emphasis in original).[95]

The Eleventh Circuit shows us, through *Solomon*, the correctness of *McCollam*, the incorrectness of *Young*, and the correctness of *Abadie* and this Court. In fact, we can go back to the early Louisiana annuity cases and, as well, back to *Beisel* (if we want to) to tie the annuity/exemption analysis together. Perhaps *Abadie, McCollam,* and this Court generate holdings that might appear to deprive creditors of real money (that looks like it's) just sitting there. However, clearly there are inherent in the analyses a set of limiting principles that preclude a parade of "semblances."

■ First, and last, there must be an annuity contract that constitutes, under applicable state law, an annuity. While the term "annuity" is perhaps somewhat elusive (*see,* for example, *Succession of Rabouin, supra,* concluding that the limitations on redemption or surrender within Louisiana's statutes are not exclusive of other arrangements), there are some bedrock components: (1) a fund; (2) transfer of the fund (as opposed to release of all claims, *etc.,* except to the right to be paid pursuant to the annuity contract); (3) limitation of control over the fund used to purchase the annuity, as the annuity has been exchanged for the fund, itself; (4) an obligation to make payments (of rent) on the basis of receipt of the fund, for life, in perpetuity, or for a term; (5) an interest, as beneficiary, or payee, of the proceeds of the annuity contract held by the person claiming the exemption.

■ What will not qualify, and if the Fifth Circuit had been looking closely at *Beisel,* it would have seen this, is a contract that resembles an annuity in that it provides, simply (on only), for payments of an obligation over time. There was no annuity contract in *Beisel.* No annuity contract in *Solomon.* Remember, there was no annuity contract in *Succession of Vidalat.* The problem with *Young,* as pointed out by *Abadie,* by *McCollam,* and finally, by this Court, is that *Young* involved an actual annuity contract, one which was issued with *Young* as payee, beneficiary, annuitant upon the payment by the Underwriter of a purchase price of some $155,000. A fund was transferred, over which, upon which, and to which Young had no ownership, dominion, or control, and upon which rent payments were to be made to Young. The annuity, however, emanated from an account receivable due Young. This is where the *Young* courts (bankruptcy, district, and Fifth Circuit) got lost. Eschewing analysis of Louisiana law for an overly general reading of *Beisel,* they made the unfortunate misstep of forgetting that an account receivable without an annuity contract cannot be an annuity, as an annuity is a particular type of contract. An account, a contractual obligation, a tort claim, a promissory note, an account receivable, depository agreements, all generate types of rights arising from different types of obligations, many of which can involve payment agreements providing for payments over time. However, none of these constitutes an annuity contract; therefore none of these, without somehow undergoing a fundamental change, can be an annuity.

We read *McCollam* and *Solomon* as cogent compatriots of *Abadie.* These are opinions authored by judges who are satisfied that if they were able to write the exemption statutes the exemption of annuities would be much narrower, but who, to their (near) chagrin, are duty bound to read and apply the statutes as written.

**95.** The court cites *In re Conner,* 172 B.R. 119, 121 (Bankr.M.D.Fla.1994), wherein the court stated (rather common-sensibly) "if all that is required to establish an annuity contract is a stream of payments over time, all installment contracts would qualify as an annuity and that is clearly not what the *McCollam* decision requires." *See also In re Dillon,* 166 B.R. 766, 769 (Bankr.S.D.Fla.1994).

## VI. Conclusion

We have attempted to cover a lot of ground. We are dealing, as was the Fifth Circuit in *Young*, with a state statute providing an unlimited exemption of payments and proceeds of annuities to beneficiaries, payees, and assignees. We have attempted to hash out the Louisiana law of annuities in light of *Young* because there needs to be a re-thinking, by the Fifth Circuit, of its confusion-producing suggestion that retention of a claim against an underwriter or purchaser of an annuity is equivalent to maintaining control over the fund used to purchase the annuity.

Of course, we have read the *Young* court as at most suggesting such a thing, given the extent to which Louisiana law is in conflict with such a suggestion. As a result, *Young* is interpreted as limited to claims which are truly "accounts receivable" as the term has been and is defined and used in Louisiana.

The distinction between Orso's claim and Young's is one which is material, only, it seems to us, not relevant to the correct legal analysis of whether an annuity is exempt.[96] But, and this is it, here we leave it.

### Appendix 1
#### WEST'S LOUISIANA STATUTES ANNOTATED

#### LOUISIANA REVISED STATUTES

#### TITLE 22. INSURANCE

#### CHAPTER 1. INSURANCE CODE

#### PART XIV. THE INSURANCE CONTRACT

§ 647. Exemption of proceeds; life, endowment, annuity

A. (1) The lawful beneficiary, assignee, or payee, including the insured's estate, of a life insurance policy or endowment policy, heretofore or hereafter effected shall be entitled to the proceeds and avails of the policy against the creditors and representatives of the insured and of the person effecting the policy or the estate of either, and against the heirs and legatees of either such person, and such proceeds and avails shall also be exempt from all liability for any debt of such beneficiary, payee, or assignee or estate, existing at the time the proceeds or avails are made available for his own use. For purposes of this Subsection, the proceeds and avails of the policy include the cash surrender value of the policy.

(2) The exemption authorized in Subsection (A)(1) from seizure under any writ, mandate, or process issued by any court of competent jurisdiction, including any bankruptcy proceedings, shall not apply to that portion of the cash surrender value, or loan value of any life insurance policy, endowment policy, or annuity contract payable upon surrender during the lifetime of the insured or annuitant which exceeds the sum of thirty-five thousand dollars if such policy or contract was issued within nine months of issuance of such writ, mandate, or process or the filing of a voluntary or involuntary bankruptcy proceeding under the United States Code. However, an insurer shall be liable only for such amounts that exceed the thirty-five thousand dollar exemption which are in the insurer's possession at the time the insurer receives, at its home office, written notice by or on behalf of a creditor of claims being made against such value or interest with specification of the amount claimed. The insurer shall have no obligation to determine the validity or the accuracy of the amount of the claim and shall be relieved of further liability of any kind with respect to the monies paid upon such request of a creditor. An insurer shall be entitled to be paid by preference and priority over the claim of any such seizing creditor the balance of any bona fide loan to such insured or owner which is secured by such interest or value in such policy or contract.

---

96. By the way, what type of claim did Orso really retain against **ONE** of the underwriters? None really. His lawyer has been paid; he has received a portion of the money. Does anyone even know who the underwriter is? What it is worth? How Orso would go about prosecuting his claim? **NO.**

B. The lawful beneficiary, assignee, or payee, including the annuitant's estate, of an annuity contract, heretofore or hereafter effected, shall be entitled to the proceeds and avails of the contract against the creditors and representatives of the annuitant or the person effecting the contract, or the estate of either, and against the heirs and legatees of either such person, saving the rights of forced heirs, and such proceeds and avails shall also be exempt from all liability for any debt of such beneficiary, payee, or assignee or estate, existing at the time the proceeds or avails are made available for his own use.

C. The lawful beneficiary designated in an Education Assistance Account depositor's agreement to receive account funds in the event of the account owner's death, including the account owner's estate, of the funds contained in an Education Assistance Account established pursuant to R.S. 17:3095, heretofore or hereafter effected, shall be entitled to the proceeds and avails of the Education Assistance account against the creditors and representatives of the account owner or the person effecting the account, or the estate of either, and against the heirs and legatees of either such person, saving the rights of forced heirs, and such proceeds and avails shall also be exempt from all liability for any debt of such beneficiary or estate existing at the time the proceeds and avails are made available for his own use.

D. The provisions of Subsections A, B, and C of this Section shall apply:

(1) Whether or not the right to change the beneficiary is reserved or permitted in the policy, contract, or Education Assistance Account depositor's agreement; or

(2) Whether or not the policy, contract, or Education Assistance Account depositor's agreement is made payable to the person whose life is insured, to his estate or to the estate of an annuitant or to the estate of an Education Assistance Account owner if the beneficiary, assignee or payee shall predecease such person; except, that this Subsection shall not be construed so as to defeat any policy or contract provision which provides for disposition of proceeds in the event the beneficiary, assignee, or payee shall predecease the insured, annuitant, or Education Assistance Account owner.

E. No person shall be compelled to exercise any rights, powers, options, or privileges under any such policy, contract, or Education Assistance Account depositor's agreement.

F. There shall be excepted from the provisions of this Section a debt secured by a pledge of a policy, any rights under such policy that may have been assigned, and any advance payments made on or against such policy.